# 24-2038-cr

## United States Court of Appeals

*for the*

## Second Circuit

———❖———

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

OLEG VLADIMIROVICH DERIPASKA, AKA Sealed Defendant 1,
OLGA SHRIKI, EKATERINA OLEGOVNA VORONINA,
AKA Sealed Defendant 4, AKA Ekaterina Olegovna Voronia,
AKA Ekaterina Olegonva Voronina,

*Defendants,*

NATALIA MIKHAYLOVNA BARDAKOVA, AKA Sealed Defendant 3,
AKA Natalia Nikhaylovna Bardakova,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF FOR DEFENDANT-APPELLANT
## NATALIA MIKHAYLOVNA BARDAKOVA

ROBERT J. ANELLO
BRIAN A. JACOBS
COURTNEY MORPHET
MORVILLO ABRAMOWITZ GRAND
    IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600
*Attorneys for Defendant-Appellant
Natalia Mikhaylovna Bardakova*

CP COUNSEL PRESS   (800) 4-APPEAL • (332645)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................... iii

PRELIMINARY STATEMENT ...................................................... 1

STATEMENT OF JURISDICTION ................................................. 3

ISSUES PRESENTED ................................................................. 4

STATEMENT OF THE CASE ........................................................ 4

STATEMENT OF FACTS ............................................................. 5

    A.    The Government's Defective Indictment .................................... 5

    B.    Ms. Bardakova's Motion to Dismiss Based on Improper Venue and a Lack of Due Process ........................................................ 10

    C.    The District Court's Opinion and Order Disentitling Ms. Bardakova ............................................................................ 16

SUMMARY OF ARGUMENT ..................................................... 19

STANDARD OF REVIEW .......................................................... 20

ARGUMENT ............................................................................ 21

POINT I

The District Court Erred When It Determined that Ms. Bardakova Meets the Definition of a "Fugitive" Because She Did Not Flee Judicial Process When She Went Home, and Because She Is Not Attempting to Avoid Prosecution by Remaining at Home .................. 21

    A.    Applicable Law ......................................................................... 21

    B.    The District Court Erred by Finding that Ms. Bardakova Meets the Definition of a "Traditional Fugitive" Because She Did Not Flee Judicial Process When She Went Home .......................... 23

    C.    The District Court Erred by Finding in the Alternative that Ms. Bardakova Meets the Definition of a "Constructive-Flight Fugitive" Because She Is Not Attempting to Avoid Prosecution by Remaining at Home ........................................................... 29

POINT II

The District Court Abused Its Discretion by Concluding that
Disentitlement Is Justified Because Disentitling Ms. Bardakova Does
Not Serve Any of the Purposes of the Doctrine ..................................36

    A.     Applicable Law ..........................................................................36

    B.     The District Court Abused its Discretion in Finding that
           Disentitlement Served the Objectives of the Doctrine .............37

CONCLUSION..............................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Case(s)**                                                                **Pages**

*Bar-Levy v. U.S. Dep't of Just.*,
  990 F.2d 33 (2d Cir. 1993) ................................................................. 27

*Collazos v. United States*,
  368 F.3d 190 (2d Cir. 2004) ................................................................ 23

*Degen v. United States*,
  517 U.S. 820 (1996) ............................................................... 22, 35, 38

*Empire Blue Cross & Blue Shield v. Finkelstein*,
  111 F.3d 278 (2d Cir. 1997)............................................................ 22, 27

*Gao v. Gonzales*,
  481 F.3d 173 (2d Cir. 2007) ........................................................ 18, 26, 40

*Klipsch Grp., Inc., v. ePRO E-Com. Ltd.*,
  880 F.3d 620 (2d Cir. 2018) ................................................................ 20

*Nen Di Wu v. Holder*,
  646 F.3d 133 (2d Cir. 2011) ........................................................... 37, 42

*United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland
  Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*,
  554 F.3d 123 (D.C. Cir. 2009)............................................................. 31

*United States v. $525,695.24, Seized from JPMorgan Chase Bank Inv. Acct.
  #xxxxxxxx*,
  869 F.3d 412 (6th Cir. 2017) .............................................................. 31

*United States v. Awadalla*,
  357 F.3d 243 (2d Cir. 2004) ........................................................... 26, 27

*United States v. Bescond*,
  24 F.4th 759 (2d Cir. 2021) .......................................................... Passim

*United States v. Cornelson,*
 595 F. Supp. 3d 265 (S.D.N.Y. 2022) ........................................................... 33, 34

*United States v. Juwa*,
 508 F.3d 694 (2d Cir. 2007) ................................................................... 39

*United States v. Lopez Bello*,
 No. 19 Cr. 144 (AKH), 2023 WL 3199968 (S.D.N.Y. May 2, 2023) ........... 34, 35

*United States v. Morgan*,
 254 F.3d 424 (2d Cir. 2001) ................................................................... 27

*United States v. Stephenson*,
 895 F.2d 867 (2d Cir. 1990) ................................................................... 10

## Statutes

18 U.S.C. § 2 ...................................................................................................... 5

18 U.S.C. § 1001 ............................................................................................ 5, 10

18 U.S.C. § 2466(a)(1) ................................................................................... 28, 29

18 U.S.C. § 3231 ................................................................................................. 3

18 U.S.C. § 1519 ................................................................................................. 5

50 U.S.C. § 1702(b)(4) ........................................................................................ 11

50 U.S.C. § 1705 ................................................................................................. 4

## Rules

Fed. R. Crim. P. 12(b)(3)(A)(i) ........................................................................... 10

## Regulations

31 C.F.R. § 589.201 .......................................................................................... 4, 5

Executive Order 13660 ...................................................................................... 4, 6

Executive Order 13661 ...................................................................................... 4, 6

Executive Order 13662 ........................................................................ 4, 6

**Other Authorities**

Black's Law Dictionary (5th ed. 1979).................................................. 22

## PRELIMINARY STATEMENT

In *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021), this Court rejected the government's effort to apply the fugitive disentitlement doctrine to prevent a district court from considering a motion to dismiss filed by a foreign defendant who simply continued to reside in her home country instead of appearing here to contest the charges. With that decision, this Court made clear that the fugitive disentitlement doctrine does not stop non-fugitive foreign defendants residing in their home countries from challenging facially defective indictments.

Defendant-Appellant Natalia Mikhaylovna Bardakova is a foreign defendant who resides in her home country, and who moved to dismiss the government's facially defective indictment against her. The defective indictment alleges that she violated the law by helping a non-sanctioned woman give birth in the United States, by helping a sanctioned person with retail purchases of things like flowers and t-shirts while she was outside the United States, and by making false statements to FBI agents during a visit to Los Angeles. As Ms. Bardakova argued in her motion, among other things, the indictment is defective because no basis exists for venue over the false statements charge, which is based entirely on conduct in Los Angeles, and because the indictment violates the due process protection against the extraterritorial application of United States law. Under *Bescond*, the District Court should have assessed the motion on the merits.

1

The United States District Court for the Southern District of New York (Castel, J.), however, refused to consider Ms. Bardakova's motion on the merits, and erroneously applied the fugitive disentitlement doctrine to deny the motion. The District Court ruled that Ms. Bardakova qualifies as a fugitive, and that disentitlement is proper because it serves the purposes of the doctrine. Those determinations were wrong and fly in the face of this Court's decision in *Bescond*.

This Court reviews de novo the question of whether a defendant meets the definition of a fugitive, and Ms. Bardakova is not a fugitive here. She is not a "traditional" fugitive because she left this country when she had no reason to remain here, she was in Russia when charges were filed, and she did not flee from the judicial process. She is not a "constructive-flight fugitive" because she is not refusing to come to the United States in order to avoid prosecution. Rather, like the defendant in *Bescond*, "she simply remains at home, as her home country permits her to do." 24 F.4th at 772. For these reasons alone, this Court should reverse the District Court's order.

Even if this Court deems Ms. Bardakova a fugitive, disentitlement still would not be warranted because disentitlement here does not meet the purposes of the doctrine, which are "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation

of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Id.* at 773-74. With respect to each of these prongs, this Court found in *Bescond* that the goals of disentitlement were not served given, among other things, the defendant's "innocent residence as a foreign citizen abroad," and given "her nonfrivolous challenge to the extraterritoriality of the criminal statute." *Id.* at 775. Under *Bescond*, this Court should reach the same result here.

The District Court's disentitlement decision cannot be reconciled with *Bescond*, and this Court should reverse.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over Ms. Bardakova's motion to dismiss the Indictment pursuant to 18 U.S.C. § 3231. In an Opinion and Order entered on July 25, 2024, the District Court found that Ms. Bardakova meets the definition of a "fugitive" and disentitled her from challenging the Indictment. (A-140-147.)[1] Ms. Bardakova filed a timely notice of appeal. (A-148.) This Court has jurisdiction pursuant to the collateral order doctrine to review the District Court's order determining that Ms. Bardakova is a fugitive and disentitling her. *See Bescond*, 24 F.4th at 764 ("[w]e conclude that we have jurisdiction to review the order disentitling Bescond, which we reverse, and we remand for

---

[1] "A" refers to the appendix filed together with this brief.

further proceedings to consider or reconsider the merits of her motions to dismiss").

## ISSUES PRESENTED

1. Whether the District Court erred in determining that Ms. Bardakova meets the definition of a "fugitive," which this Court reviews de novo.

2. Whether the District Court erred in disentitling Ms. Bardakova, which this Court reviews for abuse of discretion.

## STATEMENT OF THE CASE

Defendant-Appellant Natalia Bardakova appeals from an Opinion and Order entered on July 25, 2024, by the Honorable P. Kevin Castel of the United States District Court for the Southern District of New York, finding that Ms. Bardakova qualifies as a "fugitive" and disentitling her from moving to dismiss the charges against her.

Superseding Indictment S1 22 Cr. 518 (PKC) (the "Indictment") was filed on September 28, 2022, charging Ms. Bardakova and three codefendants in four counts, two of which name Ms. Bardakova. (A-11-41.) Count One charges Ms. Bardakova, as well as codefendants Oleg Deripaska and Olga Shriki, with conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662 (together, the "Ukraine-Related Executive Orders"), and 31 C.F.R.

4

§ 589.201.  Count Two charges Ms. Shriki alone with destruction of records in violation of 18 U.S.C. §§ 1519 and 2.  Count Three charges Ms. Bardakova alone with making false statements to FBI agents in violation of 18 U.S.C. § 1001. Count Four charges Ekaterina Voronina alone with false statements in violation of 18 U.S.C. § 1001.

The government unsealed the Indictment on September 29, 2022, the day after it was filed, and arrested Ms. Shriki, whose case remains pending before the District Court.  The other three defendants (including Ms. Bardakova) have not been arrested.

On November 3, 2023, Ms. Bardakova moved to dismiss the Indictment. (A-45, A-46-73.)  In an Opinion and Order dated July 24, 2024, and entered the next day, the District Court denied the motion to dismiss on the ground that Ms. Bardakova qualifies as a "fugitive," and that disentitlement was warranted.  (A-140-147.)  On July 31, 2024, Ms. Bardakova filed a timely notice of appeal.  (A-148.)

## STATEMENT OF FACTS

### A. The Government's Defective Indictment

The Indictment alleges that from April 2018 through 2022, Mr. Deripaska evaded U.S. sanctions and that two women—Ms. Shriki and Ms. Bardakova— assisted him in various ways, mostly by helping with small retail purchases, such

as the purchase of iPhones, flowers (for others), and American Eagle branded t-shirts, and by helping to arrange for Ms. Voronina to give birth in the United States in 2020 and 2022.  (A-11, A-14-15, A-23-31.)

According to the Indictment, Ms. Bardakova is a Russian national who worked for Mr. Deripaska.  (A-11, A-14-15.)  Throughout the relevant period, Mr. Deripaska was subject to sanctions by the United States Office of Foreign Assets Control ("OFAC") pursuant to Executive Orders 13661 and 13662.  (*See* A-11, A-14-15, A-18, A-20, A-22-23.)  Per the Indictment, these sanctions prohibit the "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person."  ( A-17-18 (citing Executive Order 13660).)  Ms. Bardakova—who has not been sanctioned—allegedly knew about the sanctions imposed on Mr. Deripaska because, the Indictment alleges, she accessed news articles about the sanctions in 2018 and 2020.  (A-14, A-22-23.)

Despite knowing about the sanctions, the Indictment alleges, Ms. Bardakova nevertheless provided certain "services" to Mr. Deripaska, which generally involved providing instructions to Ms. Shriki regarding retail purchases.  (A-14-15.)  In particular, according to the Indictment, in May 2018 and sometime in 2020, Ms. Bardakova "instructed" Ms. Shriki "to purchase and send flower and gift

deliveries on behalf of DERIPASKA to DERIPASKA's social contacts in the United States and Canada," which included, among other things, "two Easter gift deliveries to a U.S. television host, two flower deliveries to a then-former Canadian Parliament member, and two flower deliveries in 2020" to Ms. Voronina, "while she was in the United States to give birth to DERIPASKA's child." (A-24.)

Along similar lines, the Indictment alleges that at some unspecified time in 2020, Ms. Bardakova "instructed" Ms. Shriki "to purchase items in the United States for DERIPASKA's personal use, such as iPhones and clothing." (A-24.) With respect to the clothing, the Indictment specifies that Ms. Bardakova sent Ms. Shriki, "who was then living in the United States, an image of an American Eagle branded t-shirt, writing 'OV wants these t-shirts, 10 counts, size XL. Could you find them and urgently send them?'" (A-25.)

The Indictment alleges that beyond "instructing" Ms. Shriki regarding retail purchases, Ms. Bardakova played a part in planning for Ms. Voronina to give birth in the United States. Specifically, the Indictment alleges that from July through December 2020, "SHRIKI and BARDAKOVA coordinated with various companies and individuals to provide, among other arrangements, (1) registration at the hospital where VORONINA gave birth, (2) obstetrical care while VORONINA was in Los Angeles, California, (3) rental of a two-story penthouse apartment in Beverly Hills, California, where VORONINA stayed for

7

approximately six months (the 'Beverly Hills Penthouse'), (4) childcare in the form of at least five nannies and a housekeeper, (5) cord blood and placenta preservation, and (6) VORONINA's arrival and departure from the United States on a private jet." (A-25-26.) The Indictment further alleges that Ms. Bardakova "caused" payments to be made to these various service providers (A-26-27) and later assisted in obtaining a passport and birth certificate for the child. (A-28.)

Two years later, in about 2022, the Indictment alleges, Ms. Bardakova again assisted with preparations for Ms. Voronina to give birth in the United States. Per the Indictment, in April 2022, Ms. Bardakova "travelled to the United States and coordinated the arrangements for VORONINA's planned stay, including a charter flight for VORONINA to fly into the United States, a rented house in Beverly Hills, and potential appointments with the same obstetrician." (A-29.)

The Indictment specifically alleges that on or about May 13, 2022, Ms. Bardakova "traveled to Los Angeles to tour houses potentially to rent for VORONINA and for the benefit of DERIPASKA," and later "coordinated" payments to intermediaries in Russia to have a "U.S.-based entity fund the cost of the Beverly Hills house rental." (A-29, A-30.) As alleged in the Indictment, Ms. Bardakova booked Ms. Voronina's travel to the United States, and on June 1 or 2, 2022, Ms. Voronina in fact traveled to Los Angeles (but was refused entry to the United States). (A-30-31, A-16.)

On the day Ms. Voronina traveled to Los Angeles, special agents from the FBI allegedly met Ms. Bardakova "at the Los Angeles airport," where she was awaiting Ms. Voronina's arrival.  (A-33.)  Agents then accompanied Ms. Bardakova "back to her hotel where they interviewed her in the lobby."  (A-33.)  Ms. Bardakova allegedly made statements during that interview[2] that the Indictment asserts were materially false: that "she had never communicated with DERIPASKA directly"; that "she did not assist VORONINA with VORONINA's trip in 2020 to give birth"; that she "did not send any money from BARDAKOVA's accounts for expenses associated with that trip"; and that she "had never visited DERIPASKA's property" located in New York.  (A-33-34.)  Three days after the voluntary interview, on June 6, 2022, Ms. Bardakova departed the United States.  (A-143.)  The Indictment does not allege that Ms. Bardakova was ever told she was a target or a subject of any investigation, or that she was asked to remain in the United States.[3]

---

[2] Paragraph 22 of the Indictment says that Ms. Bardakova's alleged statements to the FBI took place on or about June 3, 2022, but paragraph 29 says the statements were made a day earlier, on or about June 2, 2022.  (A-33, A-36.)

[3] The government below proffered that the FBI agents served Ms. Bardakova with a subpoena at the airport that required her appearance and testimony in the Southern District of New York, but the government acknowledged that "[i]n lieu of appearing before the grand jury," Ms. Bardakova voluntarily "provided two cell phones to FBI agents to transport to the grand jury in this District."  (A-86, A-94, A-135.)

On September 28, 2022, nearly four months later, the government filed the Indictment and arrested Ms. Shriki the next day. (A-143.) No other defendants have been arrested.

## B. Ms. Bardakova's Motion to Dismiss Based on Improper Venue and a Lack of Due Process

On November 3, 2023, Ms. Bardakova moved to dismiss Counts One and Three of the Indictment, which are the only counts against her. (A-45, A-46-73.)

First, Ms. Bardakova argued that the District Court should dismiss Count Three—alleging that Ms. Bardakova made false statements to FBI agents in violation of 18 U.S.C. § 1001—for improper venue pursuant to Rule 12(b)(3)(A)(i) of the Federal Rules of Criminal Procedure. (A-56-59.) Ms. Bardakova explained that "[v]enue under Section 1001 lies where the false statement was completed." (A-56 (citing *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)).) Here, the Indictment charges that Ms. Bardakova made the alleged statements in Los Angeles, after FBI agents met her "at the Los Angeles airport" and took her "back to her hotel where they interviewed her in the lobby." (A-56 (citing A-33-34).) The purported statements thus were uttered nowhere near the Southern District of New York, and the Indictment is silent with respect to what the FBI did with the statements following the interview.

Second, Ms. Bardakova argued that the District Court should dismiss Count One, charging conspiracy to violate IEEPA, on the ground that the count violated

the due process requirement of notice, as well as the due process bar on the extraterritorial application of United States law. (A-59-63.) To the extent Count One was based on Ms. Bardakova helping Ms. Voronina (who is not sanctioned) give birth in the United States, she explained, Count One violated the due process requirement of fair notice because a person of ordinary intelligence would not have reasonably understood Ms. Bardakova's alleged conduct to be prohibited. (A-60.) That is, the relevant regulations provide no notice that helping a woman who is not sanctioned give birth can amount to a criminal offense.

Further, Ms. Bardakova argued, to the extent Count One was based on Ms. Bardakova's other alleged conduct—primarily coordinating retail purchases such as flower and t-shirt deliveries—that conduct occurred while she was overseas. Ms. Bardakova explained that due process protects against the extraterritorial application of American criminal law unless the aim of the activity is to cause harm inside the United States—a far cry from delivering flowers and t-shirts. (A-62-63.) Finally, Ms. Bardakova argued, her alleged conduct falls largely outside of IEEPA's purview, which exempts from regulation "transactions ordinarily incident to travel to or from any country" and "payment of living expenses and acquisition of goods or services for personal use." (A-64 (citing 50 U.S.C. § 1702(b)(4)).)

In addition to seeking dismissal of Counts One and Three, Ms. Bardakova argued that she should be permitted to challenge the Indictment despite not

appearing before the District Court because she is not a fugitive—in either the "traditional" or "constructive-flight" sense—under the fugitive disentitlement doctrine. (A-67.) Specifically, Ms. Bardakova, who was not charged and never was even told she was a subject of any type of criminal investigation, did not flee from United States legal process in the manner of a traditional fugitive. She also did not refuse to return to the United States "*in order to* avoid prosecution," because her home is abroad, so she is not a constructive-flight fugitive. (A-68 (quoting *Bescond*, 24 F.4th at 772 (emphasis added)).) Rather, she is a Russian national and resident who returned home after the FBI interviewed her in June 2022, when she no longer had a reason to remain in the United States. In this regard, below Ms. Bardakova relied on this Court's decision in *Bescond*, in which this Court made clear that fugitive status should not be imposed on defendants who simply continue to live in their homes and do not attempt to hide: "[I]f the doctrine were to be expanded to reach someone . . . who stays at home abroad, without concealment or evasion," this Court wrote, "Congress, not the courts, should weigh the competing issues and values and determine whether such an expansion is warranted." (A-68 (quoting *Bescond*, 24 F.4th at 773).)

Ms. Bardakova further argued below that even if she qualifies as a fugitive, disentitlement is improper. Specifically, Ms. Bardakova argued that the District

Court should exercise its discretion not to disentitle her—even if she is a fugitive—because disentitling her does not serve any of the four purposes of the doctrine.

First, as to "assuring the enforceability of any decision that may be rendered against the fugitive," Ms. Bardakova explained, even without disentitlement, an adverse decision would make it very risky for her to leave her home country, which was sufficient under *Bescond* to ensure enforceability. (A-69-70.) Second, as to "imposing a penalty for flouting the judicial process," Ms. Bardakova's reasons for litigating from home are legitimate and fair, where she is a Russian citizen and would face severe personal challenges if required to travel to the United States. (A-69, A-70.) Third, as to "discouraging flights from justice and promoting the efficient operation of the courts," Ms. Bardakova's situation is not widely applicable to other defendants, so any slight deterrent effect is insufficient to warrant disentitlement. (A-69, A-70-71.) Last, as to "avoiding prejudice to the other side caused by the defendant's escape," disentitling Ms. Bardakova would cause her the severe prejudice of requiring her to travel to the United States and live here (after likely being arrested on arrival) to assert her arguments, which prejudice far outweighs any conceivable prejudice to the government. (A-69, A-71-72.)

In a lengthy opposition brief, the government defended the Indictment and argued that the District Court should disentitle Ms. Bardakova from challenging it.

First, with respect to Count Three, the government argued that the Indictment sufficiently alleged a basis for venue in the Southern District of New York. (A-101-106.) In the government's view, although Ms. Bardakova uttered her allegedly false statements in Los Angeles, venue remains proper in New York because the Indictment alleges, in standard barebones charging language, that the offense occurred "in the Southern District of New York and elsewhere," and because the statements "were transmitted to and relied upon in the Southern District of New York." (A101, A-104.) That latter allegation, however, suggesting that the statements "were transmitted to and relied upon" in New York, appears nowhere in the Indictment.

Second, the government argued that Count One states a valid offense under IEEPA and does not violate due process. (A-106-114.) The government, however, failed to address that most of Ms. Bardakova's alleged actions involved helping a non-sanctioned woman give birth, occurred entirely overseas, or both. The government also tried to wave away Ms. Bardakova's assertion that her purported conduct cannot be regulated under the IEEPA, which exempts "transactions ordinarily incident to travel" and "payment of living expenses and acquisition of goods or services for personal use." (A-109-110.) In the government's view, because Ms. Bardakova arranged "luxury" accommodations and robust childcare for the non-sanctioned Ms. Voronina, those expenses supposedly do not count as

travel or living expenses exempted under IEEPA (despite IEEPA itself containing no such limitation).  (A-109.)

Third, the government asserted that, in any event, the District Court should not permit Ms. Bardakova to challenge the Indictment and should disentitle her. (A-89-A-101.)  The government painted Ms. Bardakova as a "fugitive"—in both the traditional and constructive-flight sense—who fled the country after her interview with FBI agents (despite her having no reason to remain here).  The government attempted (unpersuasively) to distinguish *Bescond* by suggesting that unlike the defendant in that case, Ms. Bardakova "was essentially caught red-handed in the middle of committing a crime in the United States, and fled within mere days to a non-extraditable jurisdiction (her home) before she could be charged and arrested."  (A-95.)  The government also argued that disentitling Ms. Bardakova would serve the objectives of the fugitive disentitlement doctrine.  (A-97-101.)

In a reply memorandum filed on January 24, 2024, Ms. Bardakova rebutted the government's arguments on both the merits and regarding the fugitive disentitlement doctrine.  (A-115-A-139.)  With respect to the latter, Ms. Bardakova explained that the narrative set out in the government's brief bore no resemblance either to reality or to the charges in the Indictment.  According to the Indictment, Ms. Bardakova spoke with FBI agents in California when they approached her,

voluntarily answered their questions at her hotel, provided them with two cell phones, and then returned to her home country. (A-135.) No allegation in the Indictment asserts that Ms. Bardakova was aware that the government suspected her of committing a crime and intended to indict her or that she left the country for some improper reason. Nor does the Indictment or the government's opposition brief identify any reason why Ms. Bardakova would have stayed alone in a hotel in Los Angeles for months rather than returning home, Ms. Bardakova explained. She thus did not flee "before she could be charged and arrested" (A-95); she simply returned home after Ms. Voronina was denied entry and Ms. Bardakova had no reason to remain here. (A-135-136.) The government did not seek to charge and arrest her until several months later.

### C. The District Court's Opinion and Order Disentitling Ms. Bardakova

On July 24, 2024, the District Court denied Ms. Bardakova's motion to dismiss. (A-140-147.) Without reaching the merits regarding the serious defects in the government's Indictment—despite extensive briefing on the merits from the parties going to important constitutional issues—the District Court held that Ms. Bardakova is a fugitive and that disentitlement was warranted. (A-144.)

The District Court confined its analysis of whether Ms. Bardakova meets the definition of a "traditional fugitive" to just two paragraphs:

> The Court concludes that Bardakova is a "traditional fugitive." She flew into Los Angeles, California on May 13,

2022 allegedly for the purpose of assisting Deripaska in evading the sanctions imposed under IEEPA. (Indictment ¶ 19(k).) Once she was physically present in the United States, she allegedly assisted Deripaska him [sic] in evading the sanctions. She found a rental house for Voronina and then coordinated $229,000 in payment to intermediaries in Russia in order for a U.S.-based entity to fund the cost of the rental. (Id. ¶ 19(l).) While physically present in the United States, she was interviewed by the Federal Bureau of Investigation's Special Agents and lied to them. (Id. ¶ 22.) She thus committed both of the charged offenses (Counts I and III) while physically present in the United States. Then, three days after her interview with the Special Agents, she returned to Russia. She committed two crimes in the United States and then "distanced herself" from the United States after she learned that the FBI was looking into her actions relating to Deripaska and the mother of his child.

Bardakova's actions are fundamentally different than the defendant's actions in United States v. Bescond, 24 F.4th at 759. Defendant Bescond "was not in the United States while allegedly committing the charged conduct." Id. at 772. She did not take "some action . . . to distance herself from the United States or frustrate arrest." Id. at 771. As explained, Bardakova committed the crimes alleged in the indictment while in the United States and then, following her interview by FBI agents that alerted her that her actions were under scrutiny, left the United States. She thus qualifies as a fugitive.

(A-144-145.)

The District Court did not grapple with the fact that Ms. Bardakova had no reason to remain in the United States after her FBI interview in June 2022—much less to remain in the U.S. for the nearly four months it took the government to obtain an Indictment in September 2022—and merely returned home to her family. The District Court also did not grapple with the fact that the Indictment's allegations are merely that—allegations—and instead improperly treated the

allegations as established facts, ignoring the presumption of innocence, and assuming with no proof that Ms. Bardakova "committed both of the charged offenses." (A-145.)

As for the District Court's analysis of whether Ms. Bardakova qualifies in the alternative as a "constructive-flight" fugitive, the District Court limited its analysis to a one-sentence footnote: "If the Court is wrong that Bardakova was a 'traditional fugitive,' then she is a 'constructive-flight fugitive,' because the crimes were committed in the United States and she is on notice that her arrest is sought as is implicit in her present motion to dismiss the indictment." (A-145 n.1.)

After finding that Ms. Bardakova qualifies as a fugitive, the District Court next turned to the question of whether disentitling Ms. Bardakova would serve the purposes of the disentitlement doctrine and concluded—in a single paragraph—that disentitlement was appropriate:

> Disentitling Bardakova serves the purposes of the fugitive disentitlement doctrine. First, Bardakova's fugitive status means that it is unlikely that any decision rendered against her will be enforced; the "gravamen of [her] petition is the posture of heads I win, tails you'll never find me." Gao v. Gonzales, 481 F.3d 173, 177 (2d Cir. 2007) (internal quotation omitted). She resides in Russia, has not submitted to the Court's jurisdiction, and an adverse ruling would not affect her. Second, she has flouted the judicial process and exhibited disrespect for the laws of the United States. She allegedly entered the United States to assist Deripaska in evading lawfully imposed sanctions, did in fact assist Deripaska in doing so, lied to FBI Special Agents, and promptly returned to Russia once she became aware that her conduct attracted the attention of law

18

enforcement. Third, disentitlement would discourage flights from justice by similarly situated defendants and promote the efficient operations of the courts. It disincentivizes a departure from the United States once the individual's conduct on U.S. soil is the subject of law enforcement inquiry. Fourth, Bardakova's return to Russia could have prejudiced the government. The government promptly filed the indictment in this case—Bardakova's interview with Special Agents of the FBI occurred on June 3, 2022, and the government filed this indictment on September 28, 2022. The government's prompt filing of this indictment mitigated the risk that witness's memories would fade or evidence would grow stale. But on balance, the factors tip decidedly in favor of disentitlement.

(A-146.)

The District Court denied Ms. Bardakova's motion without considering the merits, and this appeal followed.

## **SUMMARY OF ARGUMENT**

This Court should reverse the District Court's order disentitling Ms. Bardakova and remand the case for further proceedings to consider the merits of her motion to dismiss.

First, on de novo review, this Court should reverse the District Court's determination that Ms. Bardakova meets the definition of a "fugitive." Ms. Bardakova does not qualify as a fugitive in either the "traditional" or "constructive-flight" sense. She is not a traditional fugitive because when she returned home to Russia in June 2022, she was not fleeing any judicial process or even the threat of judicial process, as she was not indicted until September 2022

and she was simply returning home when she had no reason to remain in the United States. She is not a constructive-flight fugitive either because she is not refusing to come to this country in order to avoid prosecution; rather, she is merely remaining at home.

Second, even if Ms. Bardakova qualifies as a fugitive—which she does not—the District Court abused its discretion in disentitling her because disentitlement here does not serve any of the four purposes of the doctrine.

## STANDARD OF REVIEW

This Court reviews the issue of whether Ms. Bardakova meets the definition of a "fugitive" de novo. *See Bescond*, 24 F.4th at 771. This Court reviews the separate question of "disentitlement for abuse of discretion." *Id.* at 773. A district court abuses its discretion when it "(1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Id.* (quoting *Klipsch Grp., Inc., v. ePRO E-Com. Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018)).

## **ARGUMENT**

### **POINT I**

### **The District Court Erred When It Determined that Ms. Bardakova Meets the Definition of a "Fugitive" Because She Did Not Flee Judicial Process When She Went Home, and Because She Is Not Attempting to Avoid Prosecution by Remaining at Home**

The District Court erred by holding that Ms. Bardakova meets the definition of a "fugitive," and on this basis alone, on de novo review, this Court should reverse the District Court decision disentitling Ms. Bardakova. Contrary to the District Court's determination, Ms. Bardakova is not a fugitive under either the "traditional" or "constructive-flight" analysis. She is not a "traditional fugitive" because she did not leave the United States to avoid criminal prosecution. Rather, when she went home in June 2022, she had no reason to remain in the United States, and when the government filed charges against her in September 2022, she was already outside the United States, living at home. She is not a "constructive-flight fugitive" either, that is, one who does not return to the United States from abroad specifically to avoid prosecution after learning her arrest is being sought, because she has simply remained home with no reason to come here. On de novo review, this Court should reverse the District Court's decision.

#### A.    Applicable Law

"Under the doctrine of fugitive disentitlement, a court may decline to entertain the claims of a defendant who is a fugitive from justice." *Bescond*, 24

21

F.4th at 764. Courts apply the doctrine with great care, because "[d]isentitlement is a sanction 'most severe.'" *Id.* at 767 (quoting *Degen v. United States*, 517 U.S. 820, 828 (1996)). "The severity of disentitlement is sharpened" in cases where disentitlement is "applied to bar" a challenge—such as Ms. Bardakova's—to the extraterritorial impact of a law, "that is, whether the law she is alleged to have violated can reach her and her conduct in the first place." *Id.* at 768.

The doctrine of fugitive disentitlement "applies only to fugitives from justice." *Id.* at 771 (quoting *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997)). So "in order to disentitle a litigant, a court must first determine that a litigant is a fugitive." *Id.* The "ordinary meaning" of the term "fugitive" is "[a] criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony, esp[ecially] by fleeing the jurisdiction or by hiding." *Id.* (alterations in original).

Fugitives fall into "two categories at common law: (1) traditional fugitives and (2) constructive-flight fugitives." *Id.* "A traditional fugitive is a person who, having committed a crime, flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district." *Id.* (internal quotation marks and alterations omitted) (quoting *Finkelstein*, 111 F.3d at 281 (quoting Black's Law Dictionary (5th ed. 1979))). A

22

"constructive-flight" fugitive is "a person who allegedly committed crimes while in the United States but who was outside the country—for whatever reason—when she learned that her arrest was sought and who then refused to return to the United States in order to avoid prosecution.'" *Id.* at 772 (internal quotation marks and alterations omitted) (quoting *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004)).

### B. The District Court Erred by Finding that Ms. Bardakova Meets the Definition of a "Traditional Fugitive" Because She Did Not Flee Judicial Process When She Went Home

The District Court erred by determining that Ms. Bardakova qualifies as a traditional fugitive because she did not "flee[], evade[], or escape[] arrest, prosecution, imprisonment, service of process, or the giving of testimony." *Bescond*, 24 F.4th at 771. Rather, after voluntarily answering the FBI's questions, Ms. Bardakova, who was briefly visiting the United States and staying in a hotel, returned home to Russia, and the government did not notify her she was a subject or seek her arrest until several months later.

The relevant facts in the record are not in dispute: On June 2 or 3, 2022, FBI agents met Ms. Bardakova at the Los Angeles airport. Ms. Bardakova and the agents traveled to Ms. Bardakova's hotel, where she voluntarily agreed to be interviewed, and where she provided the agents with two cell phones. Following the interview, the FBI agents did not arrest Ms. Bardakova, detain her on a material

witness warrant, tell her she personally was under investigation, or otherwise seek to keep her here in the country. Several days later, on June 6, 2022, with no reason to remain here in the United States, and with no further contact from the government, Ms. Bardakova left her hotel and the United States and went home. (A-142-143.)

On these facts, the District Court determined that Ms. Bardakova "is a 'traditional fugitive'" because after "commit[ting] two crimes in the United States," and after "her interview by FBI agents . . . *alerted her that her actions were under scrutiny*," Ms. Bardakova "left the United States." (A-144-145 (emphasis added).)

The District Court's pat analysis, however, stretches the concept of a "traditional fugitive" beyond recognition. The District Court's determination rests on its view that because Ms. Bardakova's "interview by FBI agents" supposedly "alerted her that her actions were under scrutiny," Ms. Bardakova's subsequent return home may be viewed as an effort to flee from criminal prosecution. (A-145.) Leaving the country after merely purportedly being "alerted" that one's actions are "under scrutiny" is not sufficient to make a person a fugitive. Rather, one must be fleeing more than mere "scrutiny," as one must be fleeing "arrest, prosecution, imprisonment, service of process, or the giving of testimony." *Bescond*, 24 F.4th at 771. At the time Ms. Bardakova returned home, even if she

was aware of the government's "scrutiny," the government did not have a warrant for her "arrest," there was no active "prosecution," there was no order to surrender for "imprisonment," and nobody was seeking to serve her with "process" or to obtain her "testimony." The record does not even show that Ms. Bardakova was fleeing "scrutiny" as the District Court erroneously found, where she had no reason to remain in the United States—Ms. Voronina had been denied entry—and Ms. Bardakova returned home.

If the government had tried to execute an arrest warrant or a material witness warrant on Ms. Bardakova while Ms. Bardakova had still been in the United States, or if the government had otherwise alerted Ms. Bardakova that an arrest was imminent, her departure could perhaps properly be viewed as a traditional effort to flee. Where the government merely interviewed Ms. Bardakova, however, and then took no further action in the multiple days before she left, including not even requesting she stay in the United States, her departure cannot properly be viewed as a traditional flight from arrest. Again, the record shows only that Ms. Bardakova left the United States for Russia because she had no further purpose here and resides in Russia. These facts bear no indicia of traditional fugitivity.

The District Court's view that Ms. Bardakova qualifies as a traditional fugitive, if upheld, would lead to absurd results with no basis in precedent. By the District Court's logic, after Ms. Bardakova was "alerted" that her actions were

25

"under scrutiny" in June 2022, for Ms. Bardakova to avoid the conclusion that she was a "traditional fugitive," Ms. Bardakova would have had to remain in the United States *indefinitely*, waiting to see if the government decided to charge her with a crime. Beyond Ms. Bardakova, under the District Court's view, every foreign visitor who is interviewed by a member of federal or state law enforcement would have to stay in the United States indefinitely—at least until all possible statutes of limitations expired, and notwithstanding any expiration of their visas—to avoid being deemed a traditional fugitive in a future case. No authority supports that extreme view, and the District Court's brief opinion does not cite any.

Contrary to the District Court's view, this Court's cases regarding fugitive disentitlement consistently have applied the doctrine to disentitle individuals who were not merely "aware" of the government's "scrutiny," but who were actively engaged in the legal process. *See Bescond*, 24 F.4th at 772 (collecting cases). For example, in *Gao v. Gonzales*, 481 F.3d 173 (2d Cir. 2007), this Court held that "[l]ike the criminal defendant fleeing after his conviction, an alien who fails to comply with an outstanding notice to surrender is a fugitive from justice." *Id.* at 176. An "outstanding notice to surrender," unlike a mere "awareness" of "scrutiny," is the sort of legal process the flight from which makes someone a fugitive. *Id.* Similarly, in *United States v. Awadalla*, 357 F.3d 243 (2d Cir. 2004), this Court held that because the defendant-appellant had "absconded after

challenging his judgment of conviction in this Court, there is no doubt that we have the authority to dismiss his appeal." *Id.* at 246. The defendant-appellant in *Awadalla* thus ran from an active court proceeding, rather than merely a remotely potential one. So too in *United States v. Morgan*, 254 F.3d 424 (2d Cir. 2001), where the district court disentitled a criminal defendant who fled the United States after pleading guilty and before sentencing. *Id.* at 426-27. *See also Finkelstein*, 111 F.3d at 281–82 (litigants who failed to comply with bench warrants and appear for depositions, whose whereabouts were unknown, and who faced "an immense judgment," were fugitives); *Bar-Levy v. U.S. Dep't of Just.*, 990 F.2d 33, 35 (2d Cir. 1993) (alien became a fugitive upon failing to comply with a notice to surrender for deportation).

Against this wall of authority standing for the proposition that a fugitive is someone who flees while on notice of actual legal process, the District Court did not cite any support for its novel view that a person may be deemed a traditional fugitive based merely on purportedly being "aware" that her actions are "under scrutiny." Simply going home does not make someone a traditional fugitive.

The District Court's view that merely being "alerted" of the government's "scrutiny" is sufficient to make a foreign visitor who returns home a traditional fugitive is also inconsistent with this Court's precedent setting out a distinct analysis for "constructive-flight fugitives." In *Bescond*, after explaining that a

27

"traditional fugitive" is someone who flees to avoid arrest or prosecution, this Court explained that a "constructive-flight" fugitive is "a person 'who allegedly committed crimes while in the United States but who w[as] outside the country— for whatever reason—when [she] learned that [her] arrest[ ] w[as] sought and who then refused to return to the United States in order to avoid prosecution.'" 24 F.4th at 772 (alterations in original). Under the District Court's view of traditional fugitivity, however, there would scarcely be a need to analyze "constructive flight" at all because virtually any person who leaves the country after supposedly committing "crimes while in the United States" and having some contact with law enforcement such as an interview or document production could be deemed a traditional fugitive and be required to stay in the country indefinitely awaiting charges.

The District Court's view further conflicts with Congress's definition of a "fugitive" that applies in the civil forfeiture context. In that context—which this Court has recognized involves a *broader* definition of "fugitive" than that which applies to criminal defendants, *see Bescond*, 24 F.4th at 772—a fugitive is someone who purposely leaves or declines to reenter the United States "after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution." 18 U.S.C. § 2466(a)(1). Under even this "extended" definition of fugitive, *Bescond*, 24 F.4th at 772, a

28

person qualifies as a fugitive only *after* they have "notice or knowledge of the fact that a warrant or process has been issued for his apprehension," and where the person then engages in some action "in order to avoid criminal prosecution." 18 U.S.C. § 2466(a)(1). In the District Court's view, however, an individual need not be aware of "a warrant or process" before being deemed a traditional fugitive; it is enough that a person such as Ms. Bardakova be aware that her actions were—even briefly—"under scrutiny" by the government. (A-145.) That view has no basis in the law.

Because Ms. Bardakova—a foreign visitor to the United States who stayed in a hotel—did not "flee[], evade[], or escape[] arrest, prosecution, imprisonment, service of process, or the giving of testimony," *Bescond*, 24 F.4th at 771, and because the record shows merely that she returned home after Ms. Voronina was denied entry and Ms. Bardakova had no reason to remain in the United States, she does not meet the definition of a traditional fugitive and the District Court's holding otherwise was erroneous.

### C. The District Court Erred by Finding in the Alternative that Ms. Bardakova Meets the Definition of a "Constructive-Flight Fugitive" Because She Is Not Attempting to Avoid Prosecution by Remaining at Home

Ms. Bardakova does not meet the definition of a "constructive-flight fugitive" because although she "was outside the country . . . when she learned that her arrest was sought," she did not "refuse[] to return to the United States *in order*

29

*to avoid prosecution*." *Bescond*, 24 F.4th at 772 (emphasis added) (internal alterations and quotation marks omitted). Rather, like the defendant in *Bescond*, "she simply remains at home." *Id.*

The District Court confined its analysis of whether Ms. Bardakova qualifies as a "constructive-flight fugitive" to a brief one-sentence footnote. (A-145 n.1.) In that footnote, the District Court wrote, "[i]f the Court is wrong that Bardakova was a 'traditional fugitive,' then she is a 'constructive-flight fugitive,' because the crimes were committed in the United States and she is on notice that her arrest is sought as is implicit in her present motion to dismiss the indictment." (A-145 n.1.) The District Court's footnote, however, does not address the key question under this Court's precedent, which is whether Ms. Bardakova's refusal to return to the United States was "in order to avoid prosecution." *Bescond*, 24 F.4th at 772. A person whose refusal to return to the United States is not "to avoid prosecution," and who "simply remains at home," "does not qualify as a constructive-flight fugitive." *Id.*

Ms. Bardakova argued before the District Court that she simply remains at home in Russia, the country where she has resided her whole life, and that no basis exists to conclude she is not returning to the United States "in order to avoid prosecution," where she has no bank accounts, real estate, relatives, or any other reason to visit the country. (A-68-69.) The District Court, however, ignored these

30

arguments, finding that Ms. Bardakova qualifies as a "constructive-flight fugitive" because she was on notice of the Indictment. Mere "notice" of the Indictment, however, is insufficient to render Ms. Bardakova a constructive-flight fugitive, because this Court requires the additional finding that she "refused to return to the United States *in order to avoid prosecution*." *See Bescond*, 24 F.4th at 772 (emphasis added); *see also United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 132 (D.C. Cir. 2009) (noting, in connection with constructive-flight prong of disentitlement statute for forfeiture matters, that "mere notice or knowledge of an outstanding warrant, coupled with a refusal to enter the United States, does not satisfy the statute," under which alleged fugitive must have declined to enter or reenter the country specifically "in order to avoid prosecution"); *United States v. $525,695.24, Seized from JPMorgan Chase Bank Inv. Acct. #xxxxxxxx*, 869 F.3d 412, 421 (6th Cir. 2017) (finding nothing in the record, "beyond the mere fact that [the defendant] had notice of the criminal proceeding but failed to return, that would support the district court's finding that [the defendant] was deliberately remaining in Israel to avoid prosecution" and was therefore a fugitive under the forfeiture disentitlement statute).

Courts that have properly analyzed analogous facts have concluded that comparable defendants do not qualify as fugitives. For example, in *Bescond* itself,

this Court found that Bescond did not qualify as a constructive-flight fugitive because she "simply remain[ed] at home" in France, and had "no reason to travel here," as it was "not shown that she has residence, immigration status, job, or family in this country, and she allegedly committed the charged offense entirely from abroad." 24 F.4th at 772, 774. Ms. Bardakova shares all but the last of these characteristics with Bescond. She lives in Russia, and has no status, job, or family in the United States.

Although the government alleges that part of Ms. Bardakova's offense conduct took place in the United States, unlike in *Bescond*, those allegations confirm Ms. Bardakova's lack of connection to the United States. In *Bescond*, the fact that Bescond's offense conduct did not take place in the United States helped show that Bescond was not "refusing to return to the United States to avoid prosecution," but rather "simply remains at home, as her home country permits her to do," and is therefore not a constructive-flight fugitive. 24 F.4th at 772. Here, although the government alleges that a portion of Ms. Bardakova's offense conduct took place in the United States, the nature of that conduct, as alleged in the Indictment, similarly confirms that Ms. Bardakova is not "refusing to return to the United States to avoid prosecution," but rather "simply remains at home, as her home country permits her to do." *Id.*

Ms. Bardakova's alleged conduct in the United States involves her supposedly visiting Los Angeles, staying in a hotel, seeking a temporary residence for Ms. Voronina, and then departing when Ms. Voronina was denied entry. Nothing about this alleged offense conduct suggests that Ms. Bardakova possesses any meaningful connection to the United States (such as a residence, immigration status, a job, property, or family in the country), such that the fact that Ms. Bardakova remains abroad could be deemed an effort "to avoid prosecution" here. Rather, the alleged offense conduct suggests just the opposite, as the alleged conduct makes clear that Ms. Bardakova lacks a meaningful connection here and was merely a visitor. Those allegations if anything support the inference that Ms. Bardakova is not refusing to come back "to avoid prosecution," but is merely remaining at home. Thus, although Ms. Bardakova allegedly committed a portion of her offense here while Bescond did not, that distinction does not change the fact that the reasons this Court found Bescond not to be a constructive-flight fugitive apply with equal force to Ms. Bardakova.

As another example, in *United States v. Cornelson*, the district court held that the defendant, a Brazilian citizen and resident, was not a constructive-flight fugitive. 595 F. Supp. 3d 265, 270 (S.D.N.Y. 2022). The defendant there, like Ms. Bardakova, "simply remain[ed] at home" in Brazil. *Id.* at 271. The district court rejected the government's argument that the defendant had a reason to enter the

United States based on the fact that he "own[ed] a vacation home in Florida" and used to "travel[] to the United States at least once per year, often for extended periods of time," but refused to do so to frustrate arrest. *Id.* For the district court, these ties to the United States did not change the fact that the defendant could not be said to be refusing to enter the country to avoid prosecution, but rather was merely staying at home. *Id.*

Like the defendants in *Bescond* and *Cornelson*, Ms. Bardakova is not a constructive-flight fugitive because nothing in the record shows that the fact that she has not come to the United States is attributable to an effort to avoid prosecution. Instead, "she simply remains at home," where "her government permits her to live freely." *Bescond*, 24 F.4th at 772, 774. Ms. Bardakova has *fewer* ties to the United States than the defendant in *Cornelson*, who "own[ed] a vacation home in Florida" and used to "travel[] to the United States at least once per year, often for extended periods of time." 595 F. Supp. 3d at 271.

By contrast, in *United States v. Lopez Bello*, a district court held that the defendant was a constructive-flight fugitive because evidence demonstrated that he refused to return home to the United States after he learned of the charges against him while abroad. No. 19 Cr. 144 (AKH), 2023 WL 3199968, at *1 (S.D.N.Y. May 2, 2023). There, unlike here, the defendant "lived in the United States with the intention of making it his permanent home." *Id.* He "enrolled his children in

U.S. schools, owned property in the United States, and lived a luxurious life here." *Id.* Therefore, the court reasoned that "[h]is presence abroad, in stark contrast to the defendant in *Bescond*"—and Ms. Bardakova—"[was] inextricable from [his] prosecution." *Id.*

The fact that Ms. Bardakova raised in the District Court a nonfrivolous extraterritoriality claim further weighs against the District Court's finding that she meets the definition of a fugitive. In *Bescond*, this Court noted that "it is telling the Bescond raises a nonfrivolous extraterritoriality claim" because "if the assertion of prosecutorial overreach is premised on extraterritoriality, there may be no opportunity to detect that overreach precisely because the fugitive disentitlement doctrine preempts consideration of the merits." *Bescond*, 24 F.4th at 773. This Court's concerns with not foreclosing a nonfrivolous extraterritoriality claim apply with equal force here, where Ms. Bardakova asserted in her motion to dismiss below that due process barred the bulk of the charges against her for allegedly assisting with things like flower and t-shirt deliveries while she was abroad. (A-62-63.) The District Court should have considered Ms. Bardakova's arguments for dismissal on the merits. As the Supreme Court has observed, "[i]f they have merit, the Government should not prevail; if they are groundless, the Government's interests will not be compromised by their consideration." *Degen*, 517 U.S. at 827-28.

For all these reasons, on de novo review, this Court should find that Ms. Bardakova does not qualify as either a traditional fugitive or a constructive-flight fugitive. Because Ms. Bardakova does not meet the definition of a "fugitive," this Court should reverse the District Court's decision disentitling her and remand for the District Court to consider the merits of her motion to dismiss.

## POINT II

**The District Court Abused Its Discretion by Concluding that Disentitlement Is Justified Because Disentitling Ms. Bardakova Does Not Serve Any of the Purposes of the Doctrine**

Even if this Court concludes on de novo review that Ms. Bardakova qualifies as a fugitive—which she does not—disentitlement is improper because it does not serve any of the four purposes of the doctrine. As in *Bescond*, the District Court's "conclusion that disentitlement furthered these four objectives was an abuse of discretion." 24 F.4th at 774.

### A. Applicable Law

Disentitlement serves four purposes: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Bescond*, 24 F.4th at 773-74. Even where a defendant qualifies as a fugitive, disentitlement is improper where, on balance, disentitlement

does not further these four objectives. *Id.* In general, our judicial process "seeks to resolve cases on the merits whenever possible." *Id.* at 774 (quoting *Nen Di Wu v. Holder*, 646 F.3d 133, 137 (2d Cir. 2011)).

## B. The District Court Abused its Discretion in Finding that Disentitlement Served the Objectives of the Doctrine

The District Court's cursory analysis of the four objectives of disentitlement was flawed because the analysis rested on clearly erroneous factual findings, and because the District Court reached a conclusion that cannot be located within the range of permissible decisions. *See Bescond*, 24 F.4th at 773.

The first objective is to assure the enforceability of any decision that may be rendered against the fugitive. The District Court found that disentitlement would serve this purpose because Ms. Bardakova "resides in Russia, has not submitted to the Court's jurisdiction, and an adverse ruling would not affect her." (A-146.) The District Court's decision, however, runs headlong into this Court's ruling in *Bescond*, which found on closely analogous facts that "disentitlement is a disproportionately severe response to Bescond's absence and therefore too harsh a means of ensuring mutuality in the litigation." *Bescond*, 24 F.4th at 774. This Court highlighted that Bescond, like Ms. Bardakova, "has no reason to travel here" other than "to avoid a ruinous designation as a fugitive," and "it is not shown that she has residence, immigration status, job, or family in this country." *Id.* All of these points apply with equal force to Ms. Bardakova. The mere fact that Ms.

Bardakova allegedly committed a small portion of the offense conduct in the United States in 2022 provides no basis to deviate from this Court's analysis in *Bescond*, where the focus in *Bescond* was on how the defendant there, like Ms. Bardakova here, remained at home. As the Supreme Court observed, and as this Court noted, "disentitlement is too blunt an instrument for" a foreign defendant in Ms. Bardakova's circumstances. *Degen*, 517 U.S. at 828; *Bescond*, 24 F.4th at 774.

The second objective is to impose a penalty for flouting the judicial process. The District Court found that Ms. Bardakova in fact "flouted the judicial process" because she "allegedly entered the United States to assist Deripaska in evading lawfully imposed sanctions, did in fact assist Deripaska in doing so, lied to FBI Special Agents, and promptly returned to Russia once she became aware that her conduct attracted the attention of law enforcement." (A-146.) Contrary to the District Court's determination, however, as this Court found in *Bescond*, "there is no basis for a finding that" Ms. Bardakova "is exhibiting disrespect for U.S. law." 24 F.4th at 774. All Ms. Bardakova has done since the government filed the Indictment in September 2022 is "stay home" where "her government permits her to live freely," and where her "reasons for litigating from home"—including a desire to mount a non-frivolous attack on the extraterritorial application of United

States law—"are legitimate and fair." *Id.* The District Court's conclusion to the contrary effectively ignores this Court's precedent in two ways.

First, the District Court's view that Ms. Bardakova "flouted the judicial process" by engaging in the conduct alleged in the Indictment (namely, assisting Deripaska to evade sanctions and lying to FBI agents) erroneously treats the allegations in the Indictment as evidence. *See United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) ("an indictment is not evidence of guilt . . . [it] is not meant to serve an evidentiary function" (internal quotation marks omitted)). Any criminal defendant could be said to have "flouted the judicial process" by committing the charged crimes, but the alleged criminal conduct is irrelevant to the analysis under *Bescond*, which did not consider the alleged crimes to be an effort to flout the judicial process. Rather, the question is whether a fugitive's failure to appear to contest the charges amounts to flouting the judicial process. On that score, as in *Bescond*, Ms. Bardakova was already at home abroad when the government filed charges, and her return home before charges were filed cannot properly be seen as flouting any judicial process that did not exist at the time.

Second, to the extent the District Court found that Ms. Bardakova's return to Russia after becoming "aware that her conduct attracted the attention of law enforcement" (A-146) amounted to flouting the judicial process, this determination cannot be located in the range of permissible decisions. If upheld, this ruling

39

would mean that anyone (including foreign visitors) interviewed by the FBI, but not arrested, is "flouting the judicial process" by thereafter traveling abroad. If the government had wished to institute legal process after interviewing Ms. Bardakova, but before she returned to Russia several days later, it could have done so. In the absence of any process, there was no process for Ms. Bardakova to flout. The purpose of this factor is "to redress the fugitive's affront to the dignity of the judicial process," *Gao*, 481 F.3d at 176, but where a defendant is abroad when she learns of charges, and never engages in conduct flouting the process, this factor weighs against disentitlement.

The third objective is to discourage flights from justice and promote the efficient operation of the courts. The District Court found that disentitling Ms. Bardakova would advance this objective because it would "discourage flights from justice by similarly situated defendants" and "disincentivize[] a departure from the United States once the individual's conduct on U.S. soil is the subject of law enforcement inquiry." (A-146.) The District Court's reasoning defies common sense. Per the District Court, disentitling Ms. Bardakova is necessary to disincentivize in the future individuals who are questioned by law enforcement while visiting the United States before returning to their home countries. The District Court's reasoning, however, relies on the absurd premise that foreign visitors to this country who get questioned by law enforcement would, thanks to

the example of Ms. Bardakova's case, decide to relocate to this country temporarily (and obtain whatever visas may be necessary) to await the outcome of the law enforcement inquiry, even if that inquiry took several months (as here) or even years.

In reality, when foreign visitors get questioned by law enforcement during their visits here, the visitors have no incentive to remain here in the first place, so there is no rational reason to seek to "disincentivize[]" such visitors from returning to their homes. In fact, to "disincentivize[]" such visitors from returning home would require tremendous effort and expense on the part of the federal government, as the government presumably would need to modify visa programs to enable foreign visitors to stay here indefinitely after being contacted by law enforcement, and the government would also seemingly need to make funds available to assist with the large costs of living away from home for an indefinite period at the government's behest.

As this Court put it in *Bescond*, "there exists no cohort of fugitives who would perceive an adjudication of her motions as inducement or inspiration to flee the jurisdiction of our courts." 24 F.4th at 774. To the extent the government wishes to disincentivize people such as Ms. Bardakova from leaving the country in the future, the government can resort to the simpler method of asking them to remain here at least during their interviews or of detaining them upon an effort to

leave (two options the government did not explore with Ms. Bardakova).  In any case, even if some "slight general deter[rent] effect" exists as a result of the District Court's decision—which it does not—that effect does not "outweigh the countervailing harm to the judicial process, which seeks to resolve cases on the merits whenever possible."  *Id.* (quoting *Nen Di Wu*, 646 F.3d at 137).

The fourth and final objective is to avoid prejudice to the government.  The District Court found that Ms. Bardakova's return to Russia "could have prejudiced the government" because the "government promptly filed the indictment in this case—Bardakova's interview with Special Agents of the FBI occurred on June 3, 2022, and the government filed this indictment on September 28, 2022"—which "mitigated the risk that witness's memories would fade or evidence would grow stale." (A-146.)  Again, the District Court's determinations are flawed.  The government did not "promptly" file the Indictment; rather the government waited more than three months after interviewing Ms. Bardakova to lodge charges.  Further, the District Court's concern with memories fading and evidence growing stale is undermined by the record in this case, where the government has not arrested three of the four defendants charged, and where the government has repeatedly consented to adjournments of the proceedings against the only defendant it has arrested, Ms. Shriki, whose case has now been pending for more than two years.  (A-42, A-43, A-44.)  In fact, according to the docket, in an order

dated June 14, 2023, the District Court set October 12, 2023, as the date for the next status conference in Ms. Shriki's case and excluded speedy trial time until that date. (A-44.) But there is no indication on the docket that that status conference took place in October 2023, and there has been no further order excluding speedy trial time in the year that has passed since then. (A-8-10.) Against this record, any suggestion that Ms. Bardakova's actions prejudiced the government by causing delay rings hollow.

In addition, in connection with the fourth factor, district courts must consider "the countervailing prejudice to" the defendant, *Bescond*, 24 F.4th at 775, and the District Court failed to consider the prejudice to Ms. Bardakova of not determining her motion to dismiss on the merits. As this Court has observed:

> Disentitlement enables the government to coerce [a defendant's] presence in court by imposing financial, reputational, and family hardship regardless of her guilt or innocence, and regardless of whether the indictment charges violations of a statute that applies extraterritorially. So long as the government surmounts the low threshold of securing an indictment, any soul on the planet may be deemed a fugitive, and disentitlement would then bar a challenge to extraterritoriality from abroad, requiring the foreigner to leave home and face arrest and detention to have any hope of securing dismissal. Such a result contravenes the rationales that underly disentitlement and assigns no weight to the sovereignty of other nations.

*Bescond*, 24 F.4th at 775. This Court's concerns with the prejudice disentitlement causes for a defendant apply equally to Ms. Bardakova, and the District Court ignored them.

Just as in *Bescond*, for Ms. Bardakova, "given her innocent residence as a foreign citizen abroad," and "given her nonfrivolous challenge to the extraterritoriality of the criminal statute, the exercise of discretion to disentitle her was an abuse." *Id.* All four of the purposes of disentitlement weigh against disentitling Ms. Bardakova even if she were a fugitive (which she is not). Thus, this Court should reverse the District Court's order.

## **CONCLUSION**

This Court should reverse the District Court's decision disentitling Ms. Bardakova and remand the case for further proceedings to consider the merits of her motion to dismiss.

Dated:      November 12, 2024
              New York, New York

                                    Respectfully submitted,

                    By:    */s/ Robert J. Anello*
                           ROBERT J. ANELLO
                           BRIAN A. JACOBS
                           COURTNEY MORPHET
                           MORVILLO ABRAMOWITZ
                             GRAND IASON & ANELLO P.C.
                           565 Fifth Avenue
                           New York, NY 10017
                           (212) 856-9000
                           ranello@maglaw.com
                           bjacobs@maglaw.com
                           cmorphet@maglaw.com

                           *Attorneys for Defendant-Appellant*
                           *Natalia Mikhaylovna Bardakova*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P.
32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A) because, excluding the
parts of the document exempted by Fed. R. App. P. 32(f), this document contains
10,488 words.

This document complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this
document has been prepared in a proportionally spaced typeface using Microsoft
Word in 14-point font Times New Roman.

Dated:       November 12, 2024
             New York, New York

                              By:    */s/ Brian A. Jacobs*
                                     BRIAN A. JACOBS