# 24-2038

*To Be Argued By*:
VLADISLAV VAINBERG

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 24-2038

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NATALIA MIKHAYLOVNA BARDAKOVA, also known as Sealed
Defendant 3, also known as Natalia Nikhaylovna Bardakova,

*Defendant-Appellant,*

OLEG VLADIMIROVICH DERIPASKA, also known as Sealed
Defendant 1, OLGA SHRIKI, also known as Sealed Defendant 2,
EKATERINA OLEGOVNA VORONINA, also known as Sealed
Defendant 4, also known as Ekaterina Olegovna Voronia, also known
as Ekaterina Olegonva Voronina,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR THE UNITED STATES OF AMERICA

DANIELLE R. SASSOON,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

VLADISLAV VAINBERG,
NATHAN REHN,
*Assistant United States Attorneys,
Of Counsel*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Indictment of Bardakova and Her
       Coconspirators . . . . . . . . . . . . . . . . . . . . . . . . 2

    B. The Ukraine-Related Sanctions on
       Deripaska . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C. Bardakova Helps Deripaska Violate
       Sanctions by Employing a U.S. Citizen to
       Conduct Unlawful Transactions in the
       United States . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D. The Scheme Unravels and Bardakova
       Lies to the FBI While Committing Sanctions
       Violations in the United States . . . . . . . . . . . 8

    E. Bardakova's Other Ties to the
       United States . . . . . . . . . . . . . . . . . . . . . . . . . 11

    F. The FBI Arrests Bardakova's Coconspirator
       and Bardakova Remains a Fugitive after
       Learning of the Charges . . . . . . . . . . . . . . . . 12

    G. Bardakova's Motion to Dismiss . . . . . . . . . . 12

    H. The District Court's Denial of Bardakova's
       Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT:

POINT I—The District Court Correctly Concluded that
    Bardakova Is a Fugitive . . . . . . . . . . . . . . . . . . . . 16

ii

PAGE

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 16

B. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    1. Bardakova is a Traditional Fugitive . . . 19

    2. Bardakova is a Constructive Fugitive . 23

POINT II—The District Court Did Not Abuse Its
    Discretion in Applying the Fugitive
    Disentitlement Doctrine to Bardakova . . . . . . . 27

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 27

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    1. Assuring the Enforceability of Any
       Decision . . . . . . . . . . . . . . . . . . . . . . . . . 28

    2. Flouting the Judicial Process . . . . . . . . 30

    3. Discouragement of Flight . . . . . . . . . . . 31

    4. Prejudice to the Government by the
       Defendant's Fugitive Status . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

iii

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Collazos v. United States,*
    368 F.3d 190 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . 31

*Degen v. United States,*
    517 U.S. 820 (1996) . . . . . . . . . . . . . . . . . . . . . 17, 18

*Empire Blue Cross & Blue Shield v. Finkelstein,*
    111 F.3d 278 (2d Cir. 1997) . . . . . . . . . . . . . . . 17, 23

*Hanson v. Phillips,*
    442 F.3d 789 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 17

*In re Grand Jury Subpoenas dated March 9, 2001,*
    179 F. Supp. 2d 270 (S.D.N.Y. 2001) . . . . . . . 17, 19

*Nen Di Wu v. Holder,*
    646 F.3d 133 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 17

*SEC v. Berger,*
    322 F.3d 187 (2d Cir. 2003) . . . . . . . . . . . . . . . 27, 30

*United States v. $45,940 in United States Currency,*
    739 F.2d 792 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 18

*United States v. Anglin,*
    169 F.3d 154 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 21

*United States v. Bescond,*
    24 F.4th 759 (2d Cir. 2021) . . . . . . . . . . . . . *passim*

*United States v. Blanco,*
    861 F.2d 773 (2d Cir. 1988) . . . . . . . . . . . 19, 23, 31

iv

PAGE

*United States v. Cornelson,*
   595 F. Supp. 3d 265 (S.D.N.Y. 2022) . . . . . . . . . . 26

*United States v. Eng,*
   951 F.2d 461 (2d Cir. 1991) . . . . . . . . . . . . . . . 17, 18

*United States v. Hayes,*
   118 F. Supp. 3d 620 (S.D.N.Y. 2015) . . . . . . . . 9, 18

*United States v. Lopez Bello,*
   No. 19 CR. 144 (AKH), 2023 WL 3199968
   (S.D.N.Y. May 2, 2023) . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Morgan,*
   254 F.3d 424 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . 28

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . 21

*United States v. Zedner,*
   555 F.3d 68 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . 27

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-2038

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NATALIA MIKHAYLOVNA BARDAKOVA, also known as
Sealed Defendant 3, also known as Natalia
Nikhaylovna Bardakova,

*Defendant-Appellant,*

OLEG VLADIMIROVICH DERIPASKA, also known as
Sealed Defendant 1, OLGA SHRIKI, also known as
Sealed Defendant 2, EKATERINA OLEGOVNA VORO-
NINA, also known as Sealed Defendant 4, also known
as Ekaterina Olegovna Voronia, also known as Ekate-
rina Olegonva Voronina,

*Defendants.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Natalia Mikhaylovna Bardakova seeks interlocu-
tory review of an order entered on July 24, 2024, in the

2

United States District Court for the Southern District of New York, by the Honorable P. Kevin Castel, United States District Judge, denying Bardakova's motion to dismiss the indictment.

Superseding Indictment S1 22 Cr. 518 (PKC) (the "Indictment") was filed on September 28, 2022, charging Bardakova and three codefendants in four counts, two of which name Bardakova. (A. 11-41). Count One charges Bardakova together with co-defendants Oleg Deripaska and Olga Shriki with conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), Executive Orders 13660, 13661, and 13662 (the "Ukraine-Related Executive Orders"), and implementing regulations, 31 C.F.R. Part 589.201, in violation of 50 U.S.C. § 1705. Count Three charges Bardakova with making false statements to Special Agents from the Federal Bureau of Investigation, in violation of 18 U.S.C. § 1001.

On November 3, 2023, Bardakova, through counsel and without having made any personal appearance in the District Court, filed a motion to dismiss the Indictment. On July 24, 2024, Judge Castel entered a written order denying Bardakova's motion, ruling that Bardakova was a fugitive and therefore disentitled from challenging the Indictment.

## Statement of Facts

### A. The Indictment of Bardakova and Her Coconspirators

On September 28, 2022, a grand jury sitting in the Southern District of New York returned the four-count

3

Indictment. Count One charges Oleg Deripaska, Natalia Bardakova, and Olga Shriki with conspiracy to violate IEEPA, the Ukraine-Related Executive Orders, and implementing regulations, in violation of 50 U.S.C. § 1705. (A. 11-41).[1] Count Three charges Bardakova with making false statements to FBI agents relating to her work for Deripaska. The Indictment also charges Shriki, a U.S. citizen who allegedly worked for Deripaska in the United States, with obstruction of justice, and charges Ekaterina Voronina, who is allegedly Deripaska's romantic partner, with making false statements. (*Id.*). Shriki was arrested and arraigned after the Indictment was under seal. (A. 8). Russian nationals Bardakova, Deripaska, and Voronina remain at large and are believed to be outside the United States.

The Indictment alleges that Bardakova is a longtime assistant of sanctioned Russian oligarch Oleg Deripaska. (A. 14-15). In April 2018, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Deripaska as subject to United States sanctions. As alleged, Bardakova conspired over the next four years to help Deripaska violate those sanctions by employing U.S. citizen Olga

───────────

[1] "Br." refers to Bardakova's brief on appeal; "A." refers to the appendix filed with that brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, footnotes, and previous alterations.

4

Shriki to engage in millions of dollars of unlawful financial transactions in the United States. (A. 11-12).

According to the allegations in the Indictment, Bardakova and Shriki assisted Deripaska to: (1) sell his three-million dollar music studio in California in 2019; (2) coordinate and pay hundreds of thousands of dollars of expenses related to a successful plan to have Deripaska's child obtain U.S. citizenship by birth in the United States in 2020, and an attempt to do the same with a second child in 2022; and (3) periodically buy products in the United States for Deripaska, as well as send gifts from Deripaska to others in the United States. (A. 23-31).[2]

## B.   The Ukraine-Related Sanctions on Deripaska

Oleg Deripaska is a Russian national, who at all relevant times to the Indictment, owned and controlled Basic Element Limited ("Basic Element"), a private investment and management company for Deripaska's various business interests. (A. 13-14).

IEEPA, codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under

---

[2]   Unless otherwise specified, the facts recited below are as alleged in the Indictment.

5

this chapter." 50 U.S.C. § 1705(a). In 2014, after Russia invaded the Crimean Peninsula, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. (A. 17-18). To address this national emergency, the President authorized the Secretary of the Treasury to designate individuals who meet one or more enumerated criteria. (*Id.*). Such individuals are commonly referred to as Specially Designated Nationals, or "SDNs." Executive Order 13660 prohibits, among other things, contributing or providing any funds, goods, or services by, to, or for the benefit of any SDN, and receiving any funds, goods, or services from any such person. (*Id.*). The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 4, 2024. *See* 89 Fed. Reg. 15,947 (March 4, 2024).

The President on multiple occasions expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian government with respect to Ukraine, including the deployment of Russian military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Russian government, including its purported annexation of Crimea and its use of force in Ukraine. (A. 18). Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders."

6

On April 6, 2018, OFAC designated Oleg Deripaska as an SDN pursuant to the Ukraine-Related Executive Orders. (A. 20). In particular, OFAC designated Deripaska pursuant to Executive Order 13661 for having acted or purported to act for or on behalf of a senior official of the Russian government, as well as pursuant to Executive Order 13662 for operating in the energy sector of the Russian economy. (*Id.*). At the same time, OFAC also designated Deripaska's investment company, Basic Element. (*Id.*).

## C. Bardakova Helps Deripaska Violate Sanctions by Employing a U.S. Citizen to Conduct Unlawful Transactions in the United States

Because Deripaska was an SDN, it was unlawful for any U.S. person to contribute or provide funds, goods, or services by, to, or for the benefit of Deripaska, or to receive any funds, goods, or services from Deripaska. (A. 11). Yet for over four years after he was designated, and with the assistance of Bardakova, Deripaska continued to employ U.S. citizen Olga Shriki to provide hundreds of thousands of dollars' worth of services for his benefit in the United States. (*Id.*). Shriki lived in the United States and worked for Deripaska's Basic Element in its Manhattan office between 2013 and 2018. (A. 20-21). After the imposition of sanctions, Shriki helped wind down the Basic Element office and continued to unlawfully work for Deripaska, including as a "[t]rusted contact for any assignments by OVD," *i.e.*, Oleg Vladimirovich Deripaska. (*Id.*). Shriki created a consulting business called Global Consulting Services LLC ("Global Consulting") and coordinated

7

directly with Bardakova to provide services for Deripaska and to continue receiving funds from Deripaska or entities under his control. (A. 21).

In addition to helping to coordinate Deripaska's unlawful payments to Shriki, Bardakova worked with Shriki to engage in millions of dollars of unlawful transactions for Deripaska. (A. 23-31). Deripaska "used Shriki's and Bardakova's assistance to engage in several endeavors in the United States in violation of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions, regulations," including: (1) selling Deripaska's music studio in California for approximately three million dollars in 2019 (A. 23-24); (2) arranging and paying over $300,000 in expenses related to the birth and upkeep of Deripaska's child in the United States in 2020, including a luxury penthouse rental in Beverly Hills for half a year, private jet flights in and out of the United States, private hospital costs, childcare in the form of at least five nannies and a housekeeper, and the filing of a U.S. birth certificate (A. 25-28); (3) arranging and paying over $400,000 in new expenses related to an unsuccessful attempt to coordinate the U.S. birth of a second child of Deripaska's in 2022 (A. 28-29); and (4) routinely buying products in the United States for Deripaska, and sending gifts from Deripaska to others in the United States (A. 11, 24-25).

Bardakova was central to the conspiracy, coordinating hundreds of thousands of dollars of payments to Shriki on behalf of Deripaska, passing instructions to Shriki at Deripaska's behest, and reporting to Deripaska. Among other things, Bardakova unlawfully

8

coordinated over $170,000 in payments on behalf of Deripaska to Shriki's Global Consulting bank account at a U.S. financial institution. (A. 26-27). These funds were used in part as Shriki's compensation for her unlawful employment by Deripaska, as well as to pay rent for the Beverly Hills Penthouse and to pay for medical providers, nannies, transportation, and other expenses related to Deripaska's child, for the benefit of Deripaska and Voronina. (*Id.*). Using funds from her personal bank account in Russia, Bardakova separately caused thousands of dollars of payments to various service providers for the benefit of Deripaska and Voronina in the United States. (*Id.*).

In addition, Bardakova personally travelled to the United States in 2022 to facilitate the birth of Deripaska's second child. In May 2022, Bardakova travelled to Los Angeles and toured houses to rent for Voronina's upcoming stay for Deripaska's benefit. (A. 29-30). After finding a house that met Deripaska's approval, Bardakova coordinated approximately $229,000 in payments to intermediaries in Russia in order to have a U.S.-based entity fund the cost of the Beverly Hills house rental. (A. 30).

### D. The Scheme Unravels and Bardakova Lies to the FBI While Committing Sanctions Violations in the United States

On June 2, 2022, approximately three weeks after Bardakova arrived in the United States, Bardakova went to Los Angeles International Airport to pick up Voronina after Voronina's arrival on a private jet that Bardakova and Deripaska had arranged. (A. 30, 33-

9

34). FBI agents approached Bardakova at the airport, and served her with a subpoena issued by the grand jury in the Southern District of New York. (A. 86).[3] The subpoena required Bardakova to appear before the grand jury in Manhattan "forthwith" to testify and give evidence regarding alleged violations of, among other listed statutes, IEEPA, 50 U.S.C. §§ 1702 and 1705, and to produce any cell phones in her possession to the grand jury. (A. 86). Bardakova and the FBI agents travelled back to her hotel lobby where the agents interviewed Bardakova about, among other

---

[3]    Although the facts alleged in the Indictment are sufficient to apply the fugitive disentitlement doctrine against Bardakova, the Government proffered to the District Court a limited set of additional facts related to the subpoena and to Bardakova's ties to the United States, that were relevant to the fugitive disentitlement doctrine analysis. *See, e.g.*, *United States v. Bescond*, 24 F.4th 759, 774 (2d Cir. 2021) (analyzing applicability of fugitive disentitlement to defendant who lived in France, was "never here" in the United States, and had virtually no connection to the United States); *United States v. Lopez Bello*, No. 19 CR. 144 (AKH), 2023 WL 3199968, at *1 (S.D.N.Y. May 2, 2023) (disentitling sanctioned defendant who had extensive U.S. ties, moved out of the United States after being sanctioned, and committed sanctions evasion from abroad); *United States v. Hayes,* 118 F. Supp. 3d 620, 627 (S.D.N.Y. 2015) (analyzing defendant's residency and disentitling defendant who committed LIBOR manipulation while living in Switzerland).

10

things, her work for Deripaska. (A. 33-34). In lieu of appearing before the grand jury, Bardakova provided two cell phones to the FBI agents to transport to the grand jury in this District.

In the course of the same encounter, while admitting that she had travelled to the United States to facilitate arrangements for Voronina to give birth, Bardakova made multiple false statements to the FBI agents about her work for Deripaska. For example, notwithstanding Bardakova's conversations with Deripaska cited in the Indictment (A. 27-31), Bardakova falsely stated that she had never communicated with Deripaska directly (A. 33-34). Bardakova also falsely stated that she did not assist Voronina with Voronina's trip in 2020 to give birth to her first child with Deripaska and, specifically, contrary to the allegations in the Indictment (A. 26-27), claimed that she did not send any money from her accounts for expenses associated with that trip (A. 33-34). Bardakova also made misstatements regarding properties that Deripaska had purchased in the United States. Deripaska purchased residences located at 2501 30th Street NW, Washington D.C.; 12 Gay Street, New York, New York; and 11 East 64th Street, New York, New York, which were maintained on his behalf at all relevant times, including post-sanctions. (A. 13-14). When questioned about these properties, Bardakova made a number of false statements, including that she had never visited Deripaska's property at 12 Gay Street, New York, New York (A. 33-34), despite, among other things, a selfie photograph that Bardakova took of herself standing near that house during a previous trip to New York (A. 87).

11

Meanwhile, Voronina also made misrepresentations to U.S. government officers at the airport, and was not admitted to the United States. Three days later, on June 6, 2022, Bardakova departed the United States.

### E.   Bardakova's Other Ties to the United States

As proffered by the Government to the District Court, Bardakova's encounter with the FBI was not the first time she travelled to the United States, or even the first time she travelled to the United States while working for Deripaska.

Since 2009, Bardakova has travelled to the United States more than ten times. (A. 88). Bardakova has travelled to this country for both business for Deripaska, and for her own pleasure. As evident by messages, documents, and photographs of Bardakova in New York obtained from judicially-authorized search warrants, Bardakova met with Shriki in New York during prior travels, including the selfie photograph she took of herself standing near Deripaska's house at 12 Gay Street. (A. 88). Bardakova also has an array of significant personal ties to the United States. Most significantly, she travelled to the United States and stayed for three months between September 2013 and December 2013 in order to give birth to her own son in New York. (*Id.*). Her son is thus a U.S. citizen. Bardakova separately travelled to the United States on at least two other visits with her older daughter, in 2011 and 2014. Bardakova regularly travelled to the United States prior to the COVID-19 pandemic, including at least once every year from 2009 through 2017, and

12

multiple visits in some of those years. (*Id.*). She returned to the United States in 2022 for the purpose of assisting Deripaska in violating sanctions, but left the county shortly after she was approached by the FBI.

### F. The FBI Arrests Bardakova's Coconspirator and Bardakova Remains a Fugitive after Learning of the Charges

On September 29, 2022, the Indictment charging Deripaska, Bardakova, Shriki, and Voronina was unsealed and a press release was issued announcing Shriki's arrest. Despite her prior periodic travel to the United States and knowledge of the pending charges, Bardakova has not returned to the United States and has not surrendered to United States authorities.

### G. Bardakova's Motion to Dismiss

On November 3, 2023, Bardakova, through counsel and without having made any personal appearance before the District Court, filed a motion to dismiss the charges against her in the Indictment. (A. 46). Bardakova argued that (i) venue for the false statements charge was improper in the Southern District of New York because the false statements were made to FBI agents in California; (ii) the application of IEEPA to her conduct violated due process; and (iii) the "vast majority" of her alleged sanctions-violating conduct was exempt from IEEPA. (A. 56-66).

The Government opposed that motion on December 27, 2023. In its opposition, the Government first argued that the District Court should apply the fugitive disentitlement doctrine and therefore decline to

13

consider the motion. (A. 94-101). In the alternative, the Government argued that Bardakova's motion to dismiss should be denied on the merits, noting that (i) under Second Circuit case law, venue for a false-statements charge is proper when the false statements were transmitted to the district and material to an investigation being conducted there; and (ii) the IEEPA conspiracy charge was a straightforward application of IEEPA to conduct that was covered by the statute and did not violate due process, and the allegations in the Indictment demonstrated that Bardakova knew that her conduct was unlawful. (A. 101-114).

## H. The District Court's Denial of Bardakova's Motion to Dismiss

On July 24, 2024, in an eight-page Opinion and Order, the District Court denied Bardakova's motion to dismiss the Indictment, holding that Bardakova was a traditional fugitive not entitled to seek the substantive relief in her motion. (A. 140-147).

In finding Bardakova to be a fugitive, Judge Castel applied this Court's decision in *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021). The District Court observed that a traditional fugitive is "a person who, having committed a crime, flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district." (A. 144 (quoting *Bescond*, 24 F.4th at 771)). A constructive-flight fugitive is "a person who allegedly committed crimes while in the United States but who was outside the country—for whatever reason —when she learned that her arrest was sought and

14

who then refused to return to the United States in order to avoid prosecution." (*Id.* (quoting *Bescond,* 24 F.4th at 772)). "Fugitivity implies some action by [the defendant] to distance herself from the United States or frustrate arrest." (*Id.*).

The District Court explained that as alleged, Bardakova committed both charged offenses in the Indictment while physically present in the United States and then "distanced herself" from the United States after she learned the FBI was investigating her actions:

> She flew into Los Angeles, California on May 13, 2022 allegedly for the purpose of assisting Deripaska in evading the sanctions imposed under IEEPA. (Indictment ¶ 19(k)). Once she was physically present in the United States, she allegedly assisted Deripaska him in evading the sanctions. She found a rental house for Voronina and then coordinated $229,000 in payment to intermediaries in Russia in order for a U.S.-based entity to fund the cost of the rental. (*Id.* ¶ 19(l)). While physically present in the United States, she was interviewed by the Federal Bureau of Investigation's Special Agents and lied to them. (*Id.* ¶ 22). She thus committed both of the charged offenses (Counts I and III) while physically present in the United States. Then, three days after her interview with the Special Agents, she returned to Russia. She

15

> committed two crimes in the United
> States and then "distanced herself" from
> the United States after she learned that
> the FBI was looking into her actions re-
> lating to Deripaska and the mother of his
> child.

(A. 144-145).

Judge Castel concluded that Bardakova's actions
were "fundamentally different" from the defendant in
*Bescond*. The *Bescond* defendant "was not in the
United States while allegedly committing the charged
conduct," and did not take "some action . . . to distance
herself from the United States or frustrate arrest,"
(A. 145 (quoting 24 F.4th at 771-72)). Bardakova, on
the other hand, "committed the crimes alleged in the
indictment while in the United States and then, fol-
lowing her interview by FBI agents that alerted her
that her actions were under scrutiny, left the United
States." (A. 145). The District Court concluded that
Bardakova "thus qualifies as a fugitive." (*Id.*).[4] Judge
Castel next considered the four independent purposes
behind the fugitive disentitlement doctrine, and con-
cluded that they are served through Bardakova's

———————

[4] The District Court separately held that even if
Bardakova were not deemed to be a traditional fugi-
tive, she was a " 'constructive-flight fugitive,' because
the crimes were committed in the United States and
she is on notice that her arrest is sought as is implicit
in her present motion to dismiss the indictment."
(A. 145 n.1).

16

disentitlement. Accordingly, the District Court ruled that Bardakova is not entitled to seek the substantive relief in his motion to dismiss. (*Id.*)

# A R G U M E N T

## POINT I

### The District Court Correctly Concluded that Bardakova Is a Fugitive

Relying almost exclusively on *Bescond*, Bardakova contends that the District Court erred in concluding that she is both a traditional fugitive and a constructive-flight fugitive, because she is a "foreign defendant who resides in her home country." (Br. 1). That argument should be rejected. The District Court properly found that Bardakova's active commission of the charged crimes while physically present in the United States, her flight from the United States mere days after the FBI questioned her about her involvement in those ongoing crimes, and her refusal to return and appear for her arraignment, plainly qualify her as both a traditional fugitive and a constructive-flight fugitive, and make her fundamentally different from the defendant in *Bescond*. Bardakova's substantial ties to the United States further differentiate her from *Bescond*.

## A. Applicable Law

The fugitive disentitlement doctrine is "grounded on the impropriety of permitting a fugitive to pursue a claim in federal court where he might accrue a benefit,

17

while at the same time avoiding an action of the same court that might sanction him." *United States v. Eng*, 951 F.2d 461, 465 (2d Cir. 1991), *abrogated on other grounds by Degen v. United States*, 517 U.S. 820 (1996); *see also In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270, 285-86 (S.D.N.Y. 2001) (noting the longstanding principle that "the fugitive from justice may not seek relief from the judicial system whose authority he or she evades") (quoting Martha B. Stolley, *Sword or Shield: Due Process & the Fugitive Disentitlement Doctrine*, 87 J. Crim. L. & Criminology 751, 752 (1997)). A court may therefore "decline to entertain the claims of a defendant who is a fugitive from justice." *Bescond*, 24 F.4th at 764; *Nen Di Wu v. Holder*, 646 F.3d 133, 135 & n.2 (2d Cir. 2011)); *see also Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997) ("This Court—as well as the other Courts of Appeals—has adopted the fugitive from justice rule, also known as the fugitive disentitlement doctrine.").

The doctrine, which stems from courts' "inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities," *Degen*, 517 U.S. at 823, is an equitable one that may be invoked at the court's discretion. *See Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006). Before determining whether to exercise its discretion to apply the doctrine, however, a court must first determine whether the defendant is a fugitive. *Bescond*, 24 F.4th at 771.

There are two categories of fugitives: "(1) traditional fugitives and (2) constructive-flight fugitives."

18

*Id.* A traditional fugitive is "[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." *Bescond,* 24 F.4th at 771 (alterations in original). When a defendant "actively resists extradition, or refuses to appear at his arraignment, he has constructively fled the United States and thus is a fugitive." *Eng*, 951 F.2d at 466. That is particularly so if the defendant was physically present in the United States at the time of the crime. *See United States v. Hayes,* 118 F. Supp. 3d 620, 625 (S.D.N.Y. 2015) ("defendants 'constructively flee' when they were present in the jurisdiction at the time of the alleged crime, they subsequently leave the jurisdiction, and they decide not to return upon learning they are wanted by the authorities.").

When assessing whether a defendant is a fugitive:

> [T]he intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending. This is true whether the defendant leaves the jurisdiction intending to avoid prosecution, or, having learned of charges while legally outside the jurisdiction, "constructively flees" by deciding not to return.

*United States v. $45,940 in United States Currency*, 739 F.2d 792, 796 (2d Cir. 1984), *abrogated on other grounds by Degen,* 517 U.S. 820. A defendant can be a fugitive "even when he does not 'flee' but is simply

19

found outside the jurisdiction." *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d at 287. This Court has similarly noted that "[a] person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges." *United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988). Boiled down to its essence, "[f]ugitivity implies some action by [a defendant] to distance herself from the United States or frustrate arrest." *Bescond*, 24 F.4th at 771.

This Court reviews a determination of whether a defendant meets the definition of a fugitive *de novo*. *Id.*

## B. Argument

### 1. Bardakova is a Traditional Fugitive

The District Court did not err in concluding that Bardakova qualifies as a traditional fugitive under the legal principles set forth above. As alleged, Bardakova "committed a crime" in the United States and then "fl[ed] from the jurisdiction of the court where a crime was committed." *Bescond*, 24 F.4th at 771. Specifically, Bardakova came to the United States to conduct hundreds of thousands of dollars of unlawful financial transactions here for the benefit of her sanctioned employer. While she was in the midst of perpetrating this unlawful scheme in the United States, she was approached by law enforcement and then committed another crime, making false statements to the FBI. Because she was approached by the FBI, Bardakova knew that she was being investigated for her role in

20

helping Deripaska evade sanctions, knew that she had lied to the FBI, and knew that the FBI was in possession of her personal cellphones that contained an array of evidence of her criminal conduct. Bardakova then quickly took action "to distance herself from the United States or frustrate arrest," leaving just three days after the FBI interview. *Id.*

In an effort to avoid the straightforward application of these principles here, Bardakova primarily argues that she is comparable to the defendant whom this Court found not to be a fugitive in *Bescond*. That argument fails, however, because *Bescond* did not involve a defendant who left the United States after committing a crime here. In *Bescond*, a majority panel of this Court held that the district court erred in classifying as a fugitive a defendant charged in a scheme to manipulate the United States Dollar London Interbank Offered Rate ("LIBOR") from abroad. The Court concluded that Bescond was not a traditional fugitive because she did not commit the crime in the United States and then "flee[ ] from the jurisdiction." *Bescond*, 24 F.4th at 771. Instead, the basis for domestic jurisdiction was that Bescond's conduct in Paris had allegedly had downstream effects on "the pricing of futures contracts traded on the Chicago Mercantile Exchange." *Id.* at 764. Here, by contrast, the Indictment alleges that Bardakova was actively engaged in committing the charged crimes in the United States and then promptly left the country just three days after being approached by the FBI. This places Bardakova well within the traditional definition of a fugitive.

21

Bardakova attempts to avoid that conclusion by asserting that "her departure cannot properly be viewed as a traditional flight from arrest" because the Government had not "alerted" her that an arrest was imminent. (Br. 25). Bardakova cites no legal authority for that argument, which is contrary to common sense and to case law. It is not typical for the Government to "alert" criminal suspects of a coming arrest, and a rule that a defendant cannot be classified as a fugitive unless she had been so "alerted" would risk compromising criminal investigations. It is thus no surprise that the case law contains no such requirement. What makes a person a fugitive is fleeing after "having committed a crime," *Bescond*, 24 F.4th at 771, not after being given some sort of formal notice that an arrest was forthcoming. Applying the definition in *Bescond*, Bardakova fled after committing a crime, and therefore is a fugitive. Similarly, in the analogous context of considering evidence of flight from prosecution, this Court has regularly recognized that facts like those here, such as when a person makes "arrangements to flee the country" shortly after committing a crime, are evidence of "consciousness of guilt." *United States v. Salameh*, 152 F.3d 88, 157 (2d Cir. 1998); *see also, e.g.*, *United States v. Anglin*, 169 F.3d 154, 158 (2d Cir. 1999) (evidence that defendant "left New York" on "the day after FBI agents questioned" his associate was probative of guilt). None of these flight-from-prosecution cases suggest that such evidence is only relevant if the person had been "alerted" of a potential arrest, or even identified as a suspect by law enforcement, before fleeing.

22

On appeal, Bardakova cites various cases that have applied the fugitive disentitlement doctrine where a defendant fled from a pending criminal proceeding, such as a defendant who failed to appear for sentencing after pleading guilty. (Br. 26-27). But those cases simply recognize the obvious point that flight from a pending criminal case is a *sufficient* basis to find that a person is a fugitive. They in no way suggest that the existence of pending charges at the moment of flight is a *necessary* condition to find that a person is a fugitive. Rather, the law asks whether a person fled after "having committed a crime," *Bescond*, 24 F.4th at 771, and the answer to that question in this case is plainly yes.

Nor is Bardakova helped by her assertion that she only left the United States because she "had no further purpose here." (Br. 25). That is exactly what is alleged in the Indictment and is fully consistent with Bardakova's fugitive status. Bardakova was in the country for a criminal purpose, and she fled the country because her criminal purpose for being here was disrupted by the FBI. In particular, Bardakova was here because she was tasked to "coordinate[] the arrangements" for Voronina to give birth to Deripaska's child in the United States, and she engaged in hundreds of thousands of dollars of sanctions-violating financial transactions to do so, "all for the benefit of Deripaska and Voronina." (A. 29). Thus, as Judge Castel recognized below, Bardakova's prompt decision to leave the United States after the FBI intervened supports the conclusion that she is a fugitive. (A. 145). On appeal, even Bardakova acknowledges that she left the country shortly after her purpose for being here was disrupted by law enforcement. (Br. 29). Far from being a

23

fact in her favor, that undermines her claim that she is not a fugitive.

Bardakova also argues that the District Court's ruling would lead to "absurd results" because she would have had to stay in the country "indefinitely" after being interviewed by the FBI to avoid being labeled a fugitive. (Br. 26). That is wrong. Application of the fugitive disentitlement doctrine here does not suggest that Bardakova was obligated to remain in the country after being questioned. The doctrine simply allows a court to decline to consider a defendant's claims when the defendant "is a fugitive" at the time she asserts those claims. *Bescond*, 24 F.4th at 770. Thus, the doctrine was not triggered when Bardakova first left the country, but when she filed a motion in the District Court without actually appearing there. There was an obvious way for Bardakova to make it clear that she was not a fugitive and to avoid application of the doctrine in this case. She could have simply returned to the United States, "submitted to the warrant," and subjected herself to the jurisdiction of the District Court. *See Finkelstein*, 111 F.3d at 281-82. That is the purpose of the fugitive disentitlement doctrine.

## 2. Bardakova is a Constructive Fugitive

The District Court also did not err in concluding that Bardakova qualifies as a constructive fugitive because "while abroad," she learned that she is "under indictment and ma[d]e no effort to return to the United States to face charges." *Blanco*, 861 F.2d at 779.

Bardakova again tries to avoid a straightforward application of this legal principle by comparing her

24

case to *Bescond*, but there are multiple factors that differentiate this case from *Bescond*. In *Bescond*, this Court concluded that the defendant was not a constructive-flight fugitive because she "was not in the United States while allegedly committing the charged conduct" and did not then "refus[e] to return to the United States to avoid prosecution." *Bescond*, 24 F.4th at 772. By contrast, here, Bardakova was essentially caught red-handed by law enforcement in the middle of committing two crimes in the United States, fled within three days to a non-extraditable jurisdiction as the scheme unraveled, and has refused to return to the United States. These facts plainly differentiate her from Bescond, who was "never here," took no active steps to evade United States jurisdiction, and remained home throughout the offense. *Id.* at 774.

Bardakova's case is further distinguishable from *Bescond* because Bardakova has extensive other ties to the United States, which she did not contest below and does not contest in her brief on appeal. Unlike defendants challenging fugitive disentitlement who have "never been in the country," *Bescond*, 24 F.4th at 772, Bardakova visited the United States more than *ten times* prior to her FBI encounter in 2022, and sometimes multiple times a year. (A. 88, 95). Indeed, Bardakova's own son is a U.S. citizen, a status he acquired when Bardakova travelled to the United States in 2013 for three months to give birth to him in New York. (A. 88). Further, as alleged, Bardakova routinely conducted business in the United States from 2018 through 2022 for her employer, Deripaska, even when she was located overseas, and it was Bardakova's work

25

for Deripaska that brought her into the United States in 2022.

In addition to her personal ties to this country, Bardakova's crime is inherently a United States-based offense, unlike Bescond who violated the Commodity Exchange Act while living in France and whose conduct "affected the United States—allegedly—only through a chain of other actors in other countries." *Bescond*, 24 F.4th at 774. The crux of Bardakova's offense is a four-year conspiracy from 2018 through 2022 to violate U.S. sanctions by employing a U.S. person, who resided in the United States, to conduct millions of dollars of prohibited transactions in the United States, including the sale of Deripaska's multi-million dollar music studio property and the purchase of U.S. products and services for the benefit of Deripaska. (A. 23-31). As part of her employment for Deripaska and entities controlled by Deripaska (A. 14), Bardakova directly facilitated the charged IEEPA conspiracy by personally travelling to the United States and lying about it to the FBI. Indeed, Bardakova's own extensive ties to the United States are intertwined with the sanctions violations with which she is charged. Bardakova was well positioned to help Deripaska evade sanctions and conduct financial transactions on his behalf as part of the birth-tourism scheme, for example, because of her own personal experience doing the same in the United States. These facts squarely and materially distinguish Bardakova from the defendant in *Bescond*. *See Bescond*, 24 F.4th at 774 (concluding that there existed "no reason" for Bescond to travel to the United States, because the Government had "not

26

shown that she has residence, immigration status, job, or family in this country").

In addition to her reliance on *Bescond*, Bardakova also cites *United States v. Cornelson*, 595 F. Supp. 3d 265, 270 (S.D.N.Y. 2022). (Br. 33-34). But that case also does not support Bardakova's position. The district court reasoned that Cornelson was not a fugitive because it was "undisputed that [he] was not in the United States at the time of the acts alleged in the Indictment, and that he has not been in the United States since May 2012, more than three years prior to his Indictment." Those facts stand in stark contrast to those presented here. Bardakova was physically in the United States committing overt acts charged in the IEEPA conspiracy count, and all of the acts in the false statements charge. Moreover, throughout the entire conspiracy, she allegedly helped cause another coconspirator located in the United States to take acts in this country. And whereas Cornelson last visited the United States more than three years before being notified that he was sought by U.S. authorities, Bardakova purposefully absented herself from the United States just three days after she was located by the FBI who had served her a grand jury subpoena, and to whom she made multiple material misstatements about her past and ongoing crimes on behalf of Deripaska.

27

## POINT II

### The District Court Did Not Abuse Its Discretion in Applying the Fugitive Disentitlement Doctrine to Bardakova

Bardakova contends that the district court erred in its conclusion that the objectives of the fugitive disentitlement doctrine are best served by application of the doctrine to Bardakova. The district court did not err and was well within its substantial discretion to disentitle Bardakova as a fugitive.

### A. Applicable Law

After determining whether a defendant qualifies as a fugitive, the court considers whether disentitling the fugitive would serve the objectives of the fugitive disentitlement doctrine. Those objectives are: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Bescond*, 24 F.4th at 773-74; *see also United States v. Zedner*, 555 F.3d 68, 77 (2d Cir. 2008) (listing four objectives of fugitive disentitlement doctrine). Any one of these justifications can serve as a basis for applying the doctrine. *See Zedner*, 555 F.3d at 77 (each of the four justifications "is an independently sufficient basis on which to apply the fugitive disentitlement doctrine"); *SEC v. Berger*, 322 F.3d 187, 191-92 (2d Cir. 2003), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) (noting that there are "four

28

*independent* grounds for disentitling fugitives" and that the first and fourth justifications are "the most persuasive") (emphasis added).

This Court reviews a decision to disentitle a fugitive for abuse of discretion. *Bescond*, 24 F.4th at 773; *United States v. Morgan*, 254 F.3d 424, 427 (2d Cir. 2001). A district court abuses its discretion when it:

> (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions.

*Bescond*, 24 F.4th at 773.

## B. Discussion

The District Court properly considered each of the purposes of the fugitive disentitlement doctrine, and its conclusion that each would be served by Bardakova's disentitlement was well within the range of permissible decisions and not based on any error of law or clearly erroneous factual finding.

### 1. Assuring the Enforceability of Any Decision

The first purpose of the fugitive disentitlement doctrine—assuring the enforceability of any judgment rendered against Bardakova—clearly weighs in favor of application of the doctrine here. As Judge Castel reasoned, Bardakova's fugitive status means that it is

29

unlikely that any decision rendered against her will be enforced; the "gravamen of [her] petition is the posture of heads I win, tails you'll never find me." (A. 146). "She resides in Russia, has not submitted to the Court's jurisdiction, and an adverse ruling would not affect her." (A. 146).

There is no mutuality where, as here, a ruling in Bardakova's favor on the motion to dismiss would dispose of the case, and a ruling against Bardakova would have no adverse effect on her, instead permitting her to maintain the status quo. Citing *Bescond*, Bardakova argues that disentitlement is "too harsh a means of ensuring mutuality in the litigation." (Br. 37). But this Court reached that determination in light of Bescond's particular circumstances—specifically, because Bescond "allegedly committed the charged offense entirely from abroad" and had "no reason" to travel to the United States" and no "residence, immigration status, job, or family in this country." *Bescond*, 24 F.4th at 774. As discussed above, Bardakova's circumstances are entirely different. Disentitling a defendant such as Bardakova, who indisputably committed crimes in the United States—and in fact *came to* the United States to commit those crimes, who previously spent as much as three months living in the United States, whose child is a citizen, who has travelled here more than ten times, whose work brought her here, and who actively avoids capture by U.S. law enforcement by fleeing the United States after encountering law enforcement for a country that will not extradite her and thereafter ceasing travel here, is, in contrast, not "disproportionately severe." *Id.*

30

The lack of mutuality in this case is exacerbated by the concurrent charges in the Indictment against her coconspirator and employer Deripaska, who, like Bardakova, refuses to submit to this Court's jurisdiction, while standing to potentially benefit from Bardakova's challenge to the Indictment. Allowing a sanctioned defendant to flout U.S. sanctions by sending his coconspirator employee to the United States from Russia to engage in hundreds of thousands of dollars of unlawful transactions on his behalf, and then litigate from Russia the merits of the Indictment in which both he and the coconspirator are named would be a paradigmatic example of a defendant "gam[ing] the system," which this prong of the fugitive entitlement analysis is meant to address. *See Bescond*, 24 F.4th at 774. The first justification—one of the two "most persuasive," *see Berger*, 322 F.3d at 192—thus counsels strongly in favor of applying the doctrine and disentitling Bardakova, and is itself sufficient basis to conclude that Judge Castel did not abuse his discretion in applying the fugitive disentitlement doctrine.

## 2. Flouting the Judicial Process

Applying the doctrine here would rightly impose a penalty for Bardakova's flouting the judicial process, *see Bescond*, 24 F.4th at 774, as Judge Castel found. (A. 146). This is not a case where the defendant has simply stayed home "where she remained during the allegedly criminal scheme." *Bescond*, 24 F.4th at 774. Bardakova plainly exhibited disrespect for U.S. law by coming to the United States to commit crimes, actually committing two separate charged crimes while in the United States, fleeing the United States three days

31

after lying to law enforcement, and refusing to return for more than two years (and running) since being charged. Bardakova is squarely within the "class of persons traditionally recognized as 'fugitives,' that is, persons who allegedly committed crimes while in the United States but who were outside the country—for whatever reason—when they learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution." *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004); *see also Blanco*, 861 F.2d at 779 ("A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges.").

## 3. Discouragement of Flight

Third, and relatedly, as the District Court found, allowing Bardakova to challenge the Indictment while remaining abroad would incentivize the sort of behavior Bardakova has exhibited here in evading justice and would damage the "efficient operation of the courts." *Bescond*, 24 F.4th at 774. Bardakova personally committed crimes while located in the United States, targeted the United States sanctions regime from Russia by passing instructions and hundreds of thousands of dollars in illegal funding to a U.S.-based subordinate unlawfully employed by Deripaska, and through the subordinate, helped Deripaska conduct a wide panoply of unlawful conduct in the United States, including a multi-million dollar sale of his U.S. property.

32

Under the particular circumstances of the defendant and the crime charged in *Bescond*, this Court determined that "there exists no cohort of fugitives who would perceive an adjudication of her motions as inducement or inspiration to flee the jurisdiction of our courts." *Id.* That is not at all the case here: countenancing and considering Bardakova's motion would incentivize others like her, who have deep personal and professional ties both to the United States and to another country, and who have committed crimes while physically present in the United States, to voluntarily absent themselves from this country to avoid the reach of U.S. authorities, and instead seek to contest the charges from a safe distance. That is anathema to the U.S. criminal justice system, and precisely what the fugitive disentitlement doctrine seeks to prevent. An adjudication on the merits here would also signal to powerful sanctioned individuals that unlawfully sending their subordinates to the United States to engage in transactions on their behalf and then return abroad at the first sign of detection will only redound to their benefit.

### 4. Prejudice to the Government by the Defendant's Fugitive Status

Finally, Bardakova's fugitive status works considerable prejudice against the Government. As the District Court noted, the Government promptly filed the Indictment approximately three months after Bardakova's encounter with the FBI, following the lawful review of two cell phones Bardakova surrendered to the FBI containing evidence of the offenses. As more than two years have gone by since the Indictment, witness

33

memories may fade and evidence can grow stale. The Government's inability to present its case against someone who used to regularly travel here for personal and business purposes, and who traveled here to commit the charged offenses, but now refuses to travel here to avoid arrest, is no minor inconvenience. Instead, it is prejudice caused directly by the defendant's unwillingness to return to the country to face justice for conduct that occurred in the United States and directly undermined U.S. sanctions on specific Russian actors and their facilitators. Furthermore, were the Court to allow Bardakova to challenge the Indictment from the safety of a non-extraditable country, it would force the Government to spend resources to litigate the merits of the charges (not to mention use of the Court's resources) when Bardakova is not subjecting herself to the jurisdiction of the Court.

The outcome is clear under *Bescond* and the other applicable law outlined above: Bardakova is a fugitive who "committed crimes while in the United States," 24 F.4th at 772—and each of the relevant factors weighs in favor of applying the fugitive disentitlement doctrine and declining to consider her motion on the merits. The real prejudice would come from permitting her to strategically litigate issues of her choice from abroad, while preventing the Government from moving forward to trial on the crimes charged in the Indictment.

34

## CONCLUSION

**The decision of the District Court should be affirmed.**

Dated:     New York, New York
           February 11, 2025

                    Respectfully submitted,

                    DANIELLE R. SASSOON,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

VLADISLAV VAINBERG,
NATHAN REHN,
    *Assistant United States Attorneys,*
           *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 7,865 words in this brief.

DANIELLE R. SASSOON,
*United States Attorney for the*
*Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*