24-2038-cr
*United States v. Bardakova*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2024

(Argued:  May 13, 2025   Decided:  July 28, 2025)

Docket No. 24-2038-cr

_____

UNITED STATES OF AMERICA,
Appellee,

v.

OLEG VLADIMIROVICH DERIPASKA, AKA SEALED DEFENDANT 1, OLGA SHRIKI,
EKATERINA OLEGOVNA VORONINA, AKA SEALED DEFENDANT 4, AKA EKATERINA
OLEGOVA VORONIA, AKA EKATERINA OLEGONVA VORONINA,
Defendants,

NATALIA MIKHAYLOVNA BARDAKOVA, AKA SEALED DEFENDANT 3, AKA NATALIA
NIKHAYLOVNA BARDAKOVA,
Defendant–Appellant.

_____

Before:      SACK, WESLEY, AND ROBINSON, *Circuit Judges*.

Defendant-Appellant Natalia Mikhaylovna Bardakova is a Russian citizen
who allegedly conspired with a Russian industrial magnate, Oleg Deripaska, to
evade United States sanctions by, among other things, traveling to California to
make arrangements for Deripaska's partner to give birth to her and Deripaska's
child there.  While Bardakova was in California, she allegedly lied to FBI agents
when they interviewed her about her ties to Deripaska.  Bardakova left for
Russia three days after being interviewed by the FBI and, despite being indicted
four months later for conspiracy to violate the sanctions and for making false
statements to the FBI, has not returned to the United States.  She nonetheless
moved to dismiss the indictment.  Rather than decide the merits of Bardakova's

motion to dismiss, the United States District Court for the Southern District of
New York (P. Kevin Castel, *Judge*) denied the motion after concluding that she
was a fugitive from justice who should be disentitled from relief in federal court.
In this interlocutory appeal, Bardakova argues that she is not a fugitive, and that,
even if she were, she should not have been disentitled. We conclude that
Bardakova has, at minimum, constructively fled U.S. jurisdiction by allegedly
committing a crime here before leaving and refusing to return to face
prosecution. We also conclude that the district court did not abuse its discretion
by disentitling her. We therefore AFFIRM the district court's order denying
Bardakova's motion to dismiss the indictment.

> FOR APPELLEE: VLADISLAV VAINBERG,
> Assistant United States Attorney (Nathan
> Rehn, Assistant United States Attorney, *on
> the brief*), *for* Jay Clayton, United States
> Attorney for the Southern District of New
> York, New York, NY;

> FOR DEFENDANT-APPELLANT: BRIAN A.
> JACOBS (Robert J. Anello, Courtney
> Morphet, *on the briefs*), Morvillo
> Abramowitz Grand Iason & Anello P.C.,
> New York, NY, *for* Defendant-Appellant
> Natalia Mikhaylovna Bardakova.

SACK, *Circuit Judge*:

Natalia Mikhaylovna Bardakova is a Russian citizen who was indicted for

conspiring to help a Russian industrial magnate, Oleg Deripaska, evade U.S.

sanctions against him and for making false statements to the Federal Bureau of

Investigation ("FBI") when interviewed about her connections to Deripaska.

Three days after being questioned by the FBI in California—but before being indicted—she departed for her home in Russia and has not since returned to the United States. Nonetheless, she moved through counsel to dismiss the indictment. Rather than consider the merits of Bardakova's motion to dismiss, the district court (P. Kevin Castel, *Judge*) denied her motion after invoking the fugitive disentitlement doctrine, a longstanding common-law practice of dismissing filings by criminal defendants who refuse to submit to U.S. jurisdiction. On appeal, Bardakova contends that she is not a fugitive and that, even if she were, the district court abused its discretion by disentitling her from moving to dismiss the indictment.

For the reasons set forth below, we disagree with Bardakova and **AFFIRM** the district court's order denying her motion to dismiss the indictment.

## BACKGROUND

Bardakova is a Russian citizen who has lived in Russia at all times relevant to this appeal. In September 2022, she was indicted by a grand jury sitting in the United States District Court for the Southern District of New York for conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") and for

making false statements to the FBI agents who interviewed her in the United

States about the alleged conspiracy.

### A. The IEEPA and Russian Invasion of the Crimean Peninsula

The IEEPA authorizes the President of the United States to regulate certain

economic transactions during a declared national emergency. *See* 50 U.S.C.

§§ 1701–1710. The IEEPA also provides that "[i]t shall be unlawful for a person

to violate, attempt to violate, conspire to violate, or cause a violation of any

license, order, regulation, or prohibition" that the President "issue[s] under [the

IEEPA]," with corresponding civil and criminal penalties. *Id.* § 1705(a)–(c).

In 2014, Russia invaded the Crimean Peninsula of Ukraine. In response,

President Barack Obama declared a national emergency. He then signed a series

of executive orders that, among other things, directed the Secretary of the

Treasury to designate individuals, known as "Specially Designated Nationals,"

who threaten Ukrainian sovereignty or help others in doing so. *See* Exec. Order

13660, 79 Fed. Reg. 13493 (Mar. 6, 2014); Exec. Order 13661, 79 Fed. Reg. 15535

(Mar. 16, 2014), Exec. Order 13662, 79 Fed. Reg. 16169 (Mar. 20, 2014). Consistent

with the powers delegated to the President under the IEEPA, Executive Order

13660 barred Specially Designated Nationals from dealing in property in the

4

United States.  It also prohibited "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any Specially Designated National; "the receipt of any contribution or provision of funds, goods, or services" from a Specially Designated National; and any transactions made with the purpose of evading the sanctions.  Exec. Order 13660, §§ 4–5.  Executive Orders 13661 and 13662 expanded the scope of individuals and entities subject to Executive Order 13660.  *See* Exec. Order 13661, §§ 1–5; Exec. Order 13662, §§ 1–5. The national emergency related to Ukraine and the corresponding executive orders have remained in effect since 2014.  *See, e.g.*, 90 Fed. Reg. 11009 (Feb. 28, 2025) (continuing the national emergency).

### B.  Bardakova's Alleged Conduct

In April 2018, the Department of the Treasury designated Oleg Deripaska and his investment company, Basic Element Limited, as Specially Designated Nationals.  Deripaska is a Russian national who owned several properties in the United States collectively worth tens of millions of dollars.  He and his company were designated under Executive Orders 13661 and 13662 for having acted on behalf of a senior official of the Russian government and for operating in the Russian energy sector.

The indictment alleges that Bardakova provided services for Deripaska to help him evade sanctions.  According to the indictment, Bardakova acted from Russia as an intermediary between Russia-based Deripaska and U.S.-based co-defendant Olga Shriki.  In this role, Bardakova allegedly instructed Shriki to purchase and deliver gifts from Deripaska to his social contacts in the United States and Canada, and directed Shriki to purchase items for Deripaska in the United States, such as cell phones and clothing.  In 2020, after Deripaska and co-defendant Ekaterina Olegovna Voronina agreed that they wanted their child to be born in the United States, Bardakova sent Shriki money on Deripaska's behalf to rent a property in Los Angeles for Voronina to stay in for a few months before and after the birth.  Bardakova also made payments from her personal bank account in Russia to U.S.-based service providers on Voronina's behalf.

Then, in 2022, Bardakova traveled to the United States—on Deripaska's behalf, according to the indictment—to make arrangements for Voronina to give birth to a second child in Los Angeles.  This was not Bardakova's first trip to the United States.  She had come several times on business for Deripaska before he was sanctioned; she had also come for personal reasons, including to give birth to her own child.  On this latest trip, Bardakova arrived nearly three weeks ahead

6

of Voronina to plan for Voronina's housing and medical care. After finding a suitable house in Beverly Hills, Bardakova coordinated around $229,000 in payments to rent the property. She also helped hire a private jet to transport Voronina from Moscow to Los Angeles.

Voronina's trip did not go as planned. When Voronina arrived in Los Angeles on June 2, 2022, she was immediately questioned by officers from the Department of Homeland Security. And when Bardakova arrived at the airport to pick up Voronina, FBI agents were waiting for her. The FBI agents served Bardakova with a subpoena from a grand jury in the Southern District of New York. The agents allowed Bardakova to turn over two cell phones rather than travel to New York to appear before the grand jury. The agents then interviewed Bardakova into the morning of June 3 about her connections with Deripaska. Bardakova was neither arrested nor told that she must remain in the United States.

Voronina was denied entry to the United States and sent back to Russia. Bardakova voluntarily returned home to Russia on June 6, 2022, three days after the FBI finished questioning her. She has not since returned to the United States.

### C. Procedural History

7

Nearly four months after Bardakova left the United States, she was indicted in the Southern District of New York for conspiring to violate the IEEPA and for making false statements to the FBI agents who interviewed her about the alleged conspiracy. For the IEEPA-conspiracy count, the indictment alleged that Bardakova's actions on Deripaska's behalf, such as coordinating transactions in the United States from Russia and traveling to the United States to arrange for Voronina to give birth to her and Deripaska's child, violated the IEEPA and the corresponding executive orders. For the false-statements count, the indictment alleged that, although Bardakova acknowledged when interviewed by the FBI that she was in the United States to help Voronina with giving birth, Bardakova also falsely told the FBI agents that she had never communicated directly with Deripaska, had not helped Voronina with her trip to the United States to give birth to her first child with Deripaska, had not coordinated any payments on Deripaska's behalf for that first trip, and had never visited Deripaska's properties in the United States.

Through counsel, Bardakova moved to dismiss the indictment in the United States District Court for the Southern District of New York. She argued that the IEEPA-conspiracy count violated her due process rights by denying her

fair notice of the allegedly criminal conduct and failed to state an offense because most of her alleged conduct was exempted from the IEEPA, and the remaining conduct occurred abroad beyond the IEEPA's extraterritorial reach. She also argued that venue was improper for the false-statements count because her alleged conduct occurred exclusively in California, not in the Southern District of New York. The government opposed the motion to dismiss on its merits but also urged the district court to consider Bardakova a fugitive and deny her motion.

Rather than reaching the merits, the district court denied Bardakova's motion to dismiss after determining that she was a fugitive disentitled to relief from the court. *See United States v. Bardakova*, No. 22-cr-518, 2024 WL 3538969, at *3–4 (S.D.N.Y. July 24, 2024). Bardakova then filed this interlocutory appeal.

## DISCUSSION

### I.    Fugitive Disentitlement Doctrine

Criminal defendants are entitled to defend themselves in court. *See United States v. Bescond*, 24 F.4th 759, 767 (2d Cir. 2021) (recognizing a defendant's "due process right to defend herself in court"); *In re Oliver*, 333 U.S. 257, 273 (1948) ("A person's . . . right to [her] day in court [is] basic in our system of jurisprudence . . . ."). But when a defendant chooses to become a fugitive from justice rather than submit to a federal court's jurisdiction, the court has the

inherent power to disentitle the defendant from "call[ing] upon the resources of the [c]ourt." *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam). This common-law "fugitive disentitlement doctrine" has long been recognized by U.S. courts. *See Smith v. United States*, 94 U.S. 97, 97 (1876). The doctrine has several objectives, including: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Bescond*, 24 F.4th at 773–74 (quoting *Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997)). Disentitlement can only go so far, though; the court's inherent power does not extend, for example, to trying a defendant *in absentia*. *See* Fed. R. Crim. P. 43; *Crosby v. United States*, 506 U.S. 255, 262 (1993).

A district court must complete a two-step analysis to determine whether a defendant is a fugitive who may be disentitled from relief in federal court. First, the court must decide whether the defendant is, in fact, a fugitive. *Bescond*, 24 F.4th at 771. If so, the court has discretion to disentitle the fugitive only "if doing so would serve the [fugitive disentitlement] doctrine's objectives." *Id.* On

10

appeal, Bardakova argues that she is not a fugitive, and that even if she were, the

district court abused its discretion by disentitling her.

## II.    Jurisdiction over Bardakova's Appeal

Before we can address Bardakova's arguments, however, we must address

our jurisdiction over her appeal.  *See Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir.

2006).  Although "neither party has suggested that we lack appellate

jurisdiction," we have "an independent obligation" to consider jurisdictional

issues on our own initiative.  *Id.*

As a general rule, we have appellate jurisdiction only over "final decisions

of the district courts," 28 U.S.C. § 1291—often referred to as the "final judgment

rule."  *Bescond*, 24 F.4th at 766.  In the usual criminal case, "the final judgment

rule 'prohibits appellate review until conviction and imposition of [a] sentence.'"

*Id.* (quoting *Flanagan v. United States*, 465 U.S. 259, 263 (1984)).  An interlocutory

order—such as the district court's order denying Bardakova's motion to dismiss

the indictment—is therefore usually not appealable.  *See United States v.*

*Magassouba*, 544 F.3d 387, 400 (2d Cir. 2008).  An exception to that rule, however,

is the "collateral order doctrine," under which we can review an appeal from an

interlocutory order that: "(1) conclusively determines the disputed question; (2)

resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment." *Bescond*, 24 F.4th at 766 (alterations adopted) (quoting *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982) (per curiam)).

In *Bescond*, we held that we have appellate jurisdiction under the collateral order doctrine to "review an order disentitling a foreign citizen who has remained at home abroad." *Id.* at 767. The defendant in *Bescond*, a French citizen living in France, was indicted for alleged violations of the Commodity Exchange Act based on financial reports she prepared while working for a French bank. *Id.* at 764–65. Bescond was not in the United States during any of the alleged conduct. *Id.* at 774. Rather than submit to U.S. jurisdiction, Bescond remained in France and, through counsel, moved to dismiss the indictment on several grounds, including that the Commodity Exchange Act did not apply extraterritorially to her foreign conduct. *Id.* at 765; *see also Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 265 (2010) (explaining that courts presume a statute applies only to domestic conduct unless Congress evinces a clear intent for the statute to reach conduct abroad).

The district court deemed Bescond a fugitive and disentitled her from moving to dismiss; on appeal, we concluded that the district court's order conclusively determined the disputed question of fugitivity (the first prong of the collateral-order-doctrine test) and that a fugitive disentitlement ruling is effectively unreviewable on appeal from final judgment (the third prong). *Bescond*, 24 F.4th at 767–69.  We also concluded that the district court's disentitlement ruling was independent from the merits and "important" enough to merit interlocutory review (the second prong), due in large part to Bescond's extraterritoriality claim.  *Id.* at 768 (explaining that Bescond's plausible extraterritoriality claim "sharpened" the "severity" of the district court's order). That is because the district court's disentitlement order effectively barred Bescond from challenging whether the law she allegedly violated could "reach her and her conduct in the first place," which risked not only an improper extension of the reach of U.S. law but also interference with foreign relations.  *Id.* (citing *In re Hijazi*, 589 F.3d 401, 411 (7th Cir. 2009)).

In light of *Bescond*, we have jurisdiction under the collateral order doctrine to consider Bardakova's appeal.  The first and third prongs of the test—that the order conclusively determined the disputed question of fugitivity and that a

fugitive disentitlement ruling is effectively unreviewable on appeal from final judgment—apply the same here as they did in *Bescond*. As to the factors relevant to the second prong—an important issue separate from the merits—Bardakova is somewhat distinguishable from the defendant in *Bescond*. Bardakova, unlike Bescond, has not "remained at home abroad," *id.* at 767; she does not dispute that she traveled to the United States in 2022 to arrange for Voronina to give birth in California and, while there, was interviewed by the FBI. **[Blue Br. at 10–16]** She has, however, raised an extraterritoriality challenge that could, as in *Bescond*, heighten the importance of the order disentitling her. And all the other factors that were determinative in the jurisdictional analysis in *Bescond* are also present here: Disentitlement "heavily burdens [Bardakova's] exercise of the due process right to defend herself in court"; Russia's non-extradition policy grants Bardakova "no obligation to appear in the United States"; and the disentitlement order "bears not on whether [Bardakova] violated" the IEEPA and 18 U.S.C. § 1001, "but rather on her ability to defend herself." *Id.* at 767–68. Under these circumstances, the order disentitling Bardakova presents an important issue separate from the merits, and we have jurisdiction over her appeal.

### III.    Fugitivity

We review *de novo* the district court's threshold determination that Bardakova meets the legal definition of a "fugitive." *Bescond*, 24 F.4th at 771. The parties do not dispute the facts relevant to the fugitivity analysis.

Two categories of fugitives have been recognized at common law in criminal cases: traditional fugitives and constructive-flight fugitives. *Id.* A traditional fugitive is a person who, after committing a crime, flees the jurisdiction of the court where the crime was committed or goes into hiding within the jurisdiction. *Id.* A constructive-flight fugitive is a person "[(1)] who allegedly committed crimes while in the United States but [(2)] who was outside the country—for whatever reason—when she learned that her arrest was sought and [(3)] who then refused to return to the United States in order to avoid prosecution." *Id.* at 772 (alterations adopted) (quoting *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004)). We need not address whether Bardakova meets the definition of a traditional fugitive because we conclude that she is a constructive-flight fugitive.

Bardakova indisputably meets the first two components of the three-part constructive-flight fugitive definition. First, she "allegedly committed crimes while in the United States." *Id.* Although Bardakova disputes whether her

conduct was unlawful, she does not dispute that, when she most recently visited the United States in 2022, she made arrangements for Voronina to give birth in California—part of the basis for the IEEPA-conspiracy charge in the indictment—and was interviewed by the FBI in California—the basis for the false-statements charge in the indictment. Bardakova's alleged domestic conduct distinguishes her from defendants whom courts have not considered fugitives—namely, foreign nationals indicted for conduct that occurred entirely abroad. *See id.* (holding that a French citizen living in France was not a constructive-flight fugitive because her alleged criminal conduct occurred entirely outside the United States); *United States v. Cornelson*, 595 F. Supp. 3d 265, 270–71 (S.D.N.Y. 2022) (holding that a Brazilian citizen living in Brazil was not a constructive-flight fugitive because, even though he owned property and regularly spent time in the United States, none of his alleged criminal conduct occurred in the United States).

The distinction between defendants whose conduct occurred in the United States and defendants whose conduct occurred abroad is, as with the jurisdictional analysis, motivated largely by extraterritoriality concerns—the risk that the government could aggressively apply criminal statutes to foreign

defendants and, rather than grapple with whether the statutes can be read to reach their foreign conduct, simply move to disentitle those who mount an extraterritoriality challenge.  As we put it in *Bescond*:  "[I]f our law does not reach [the defendant] or her conduct [abroad], can it be said that she is in flight from it?"  24 F.4th at 773.  Here, in contrast, there is law—at minimum, the prohibition on making false statements to government officials, 18 U.S.C. § 1001—that reaches Bardakova's alleged U.S.-based conduct.

Second, Bardakova was "outside the country—for whatever reason—when she learned that her arrest was sought."  *Bescond*, 24 F.4th at 772 (alterations adopted) (quotation marks and citation omitted).  She was in Russia when she was indicted nearly four months after she last left the United States.  And we know Bardakova learned about the indictment—after all, she has moved to dismiss it.

That leaves the final component of constructive-flight fugitivity: whether Bardakova has "refused to return to the United States in order to avoid prosecution."  *Id.*  Whether a defendant remains abroad "in order to avoid prosecution" is a question of the defendant's intent.  We have never articulated

precisely how we go about answering that question in criminal fugitive

disentitlement cases.

Even though what a person intends is theoretically a subjective inquiry, we

often discern intent by looking to objective facts and circumstances. *See, e.g.*,

*Oregon v. Kennedy*, 456 U.S. 667, 675 (1982) ("Inferring the existence or

nonexistence of intent from objective facts and circumstances is a familiar process

in our criminal justice system."); *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d

Cir. 2013) ("Subjective intent . . . is often demonstrated with objective

evidence."); *United States v. Marin*, 523 F.3d 24, 28 (1st Cir. 2008) ("Where direct

evidence of subjective intent is lacking, the [factfinder] is free to infer intent from

objective circumstances.").  We do the same when considering fugitive

disentitlement under the civil forfeiture statute.  That statute adopts the

common-law intent requirement for fugitivity—that the civil-forfeiture claimant

leaves the United States or remains abroad "in order to avoid criminal

prosecution," 28 U.S.C. § 2466(a)(1)—and we evaluate that intent "in light of 'the

totality of the circumstances.'" *United States v. Technodyne LLC*, 753 F.3d 368, 378 (2d Cir. 2014) (alteration adopted) (quoting *Collazos*, 368 F.3d at 201).[1]

We adopt the same totality-of-the-circumstances approach here. Indeed, without saying as much, that is precisely the approach that we and other courts have taken in previous criminal fugitive disentitlement cases. In those cases, as well as analogous cases, courts have considered several objective factors when determining whether an individual alleged to have committed a crime in the United States remains abroad in order to avoid prosecution:

- *Nationality and domicile.* A foreign national who lives abroad may be more likely to have a valid reason for remaining abroad than, say, a United States citizen who had been living in the United States but just happened to be abroad when indicted. *See Bescond*, 24 F.4th at 772.

---

[1] Although we recognized in *Bescond* that the civil forfeiture statute permits disentitlement of a broader swath of individuals than the common law, that is not because the civil forfeiture statute's intent element is broader, but because the civil forfeiture statute extends to individuals who have never been in the United States. *See Bescond*, 24 F.4th at 772; *see also Collazos*, 368 F.3d at 197 ("[T]he text of § 2466 makes plain that statutory disentitlement extends beyond common-law fugitives to encompass persons who may never previously have been in the United States but who know that they are subject to arrest in this country and who, therefore, refuse to enter its jurisdiction in order to avoid prosecution.").

- *Pattern of travel to the United States.* A foreign citizen who rarely travels to the United States is less likely to be remaining abroad to avoid prosecution than one who frequently travels to the United States then abruptly ceases upon learning that her arrest is sought. *Contrast id.* at 773–74 (noting Bescond's lack of travel to the United States) *and United States v. $6,976,934.65, Plus Interest*, 554 F.3d 123, 132 (D.C. Cir. 2009) (rejecting the government's argument that as a matter of law civil forfeiture claimant had constructively fled because he last left the United States six years before being criminally charged) *with Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976) (inferring constructive flight when a person "had already been out of the country for a longer period than on any of his previous similar trips" abroad).

- *Cooperation with the U.S. government.* Someone who attempted to return to the United States but was thwarted by circumstances beyond their control would seem less likely to be avoiding U.S. prosecution than someone who makes no such effort. *Contrast United States v. $45,940 in U.S. Currency*, 739 F.2d 792, 794–96 (2d Cir. 1984) (concluding that the defendant was a constructive-flight fugitive in part because, even though he was a

Canadian citizen living in Canada, he had not contacted the U.S. consulate to apply for admission to the United States to appear at his arraignment), *and United States v. Blanco*, 861 F.2d 773, 779–80 (2d Cir. 1988) (concluding that the defendant was a constructive-flight fugitive in part because she "clearly made no effort to return to the United States to face charges"), *with In re Hijazi*, 589 F.3d at 412–13 (concluding that the defendant was not a fugitive in part because "when he learned of the indictment [while in Kuwait], he surrendered himself to the Kuwaiti authorities," who decided not to extradite him).

- *Legitimate reason for remaining abroad.* Similarly, when a person has a valid excuse for not attempting to return to the United States, their continued presence abroad would be less likely to reflect an intent to avoid U.S. prosecution. *Contrast United States v. Salti*, 579 F.3d 656, 665 (6th Cir. 2009) (concluding that an individual lacked intent to avoid prosecution because he submitted a sworn declaration and a doctor's letter explaining that health issues prevented him from traveling to the United States), *and Cornelson*, 595 F. Supp. 3d at 271 (noting that a defendant remaining abroad lacked intent to avoid prosecution in part because he was "74 years

old" and "battling leukemia"),[2] *with Technodyne*, 753 F.3d at 387 (deeming civil-forfeiture claimants fugitives after discrediting their proffer that they remained abroad so as not to interfere with their children's school year because, when they left the United States, they had pulled their children out of school just before final exams).

These factors are not an exhaustive list, of course; a totality-of-the-circumstances approach necessitates case-by-case analysis.

Furthermore, a person may be considered a constructive-flight fugitive if they have multiple reasons for remaining abroad, so long as one reason is to avoid prosecution in the United States. *See Technodyne*, 753 F.3d at 383 (holding that although the civil forfeiture statute's intent requirement "requires proof of a particular intent [to avoid criminal prosecution]," it need not be "the sole, principal, or dominant intent"). For example, in *Technodyne*, despite the claimants' insistence that they remained abroad after being indicted only because they could no longer afford to live in the United States, we inferred from other circumstances that they had left the United States at least in part to avoid

---

[2] That the court in *Cornelson* reached this conclusion despite the defendant's regular pattern of travel to the United States before he was indicted illustrates that discerning intent is a totality-of-the-circumstances, case-by-case analysis.

prosecution.  *Id.* at 374, 386.  A person's alternative reasons for remaining abroad are, as discussed above, just another circumstance to consider when discerning intent.

Turning to the totality of the circumstances in Bardakova's case, we conclude based on the undisputed facts that she has remained abroad, at least in part, to avoid prosecution.  On the one hand, as Bardakova argues, she is a Russian citizen domiciled in Russia with no family, bank accounts, or real estate in the United States.  On the other hand, every other circumstance cuts in favor of constructive fugitivity.  Before being indicted, Bardakova traveled to the United States regularly; since being indicted, she has not returned.  She has made no effort to cooperate with the U.S. government.  And she has offered no reason why she is unable to travel to the United States.

In sum, because Bardakova allegedly committed crimes while in the United States but was in Russia when she learned that her arrest was sought, and because we can infer from the circumstances that she remains abroad at least in part to avoid prosecution, she meets the common-law definition of a constructive-flight fugitive.

## IV.    Disentitlement

Having concluded that Bardakova is a fugitive, we must next determine

whether the district court properly exercised its discretion to disentitle her from

moving to dismiss the indictment.  We review that decision for abuse of

discretion.  *Bescond*, 24 F.4th at 773.  A district court abuses its discretion when it

"(1) bases its decision on an error of law or uses the wrong legal standard; (2)

bases its decision on a clearly erroneous factual finding; or (3) reaches a

conclusion that, though not necessarily the product of a legal error or a clearly

erroneous factual finding, cannot be located within the range of permissible

decisions."  *Id.* (quotation marks and citation omitted).

The district court could disentitle Bardakova only "if doing so would serve

the [fugitive disentitlement] doctrine's objectives."  *Id.* at 771.  In *Bescond*, we

assessed four objectives of fugitive disentitlement: (1) assuring the enforceability

of any decision against the fugitive; (2) penalizing the fugitive for flouting the

judicial process; (3) discouraging fugitivity and promoting efficient operation of

the courts; and (4) avoiding prejudice to the other parties.  *See id.* at 773–74 (citing

*Finkelstein*, 111 F.3d at 280).  Those four objectives are not an exhaustive list of

factors relevant to whether a defendant should be disentitled.  *See id.* at 774 n.9

("Other factors may be considered."); *Nen Di Wu v. Holder*, 646 F.3d 133, 136 (2d

Cir. 2011) (listing not just those four objectives but also other relevant
considerations, such as "whether the party provides an explanation for his
fugitive status, the extent to which a party has truly evaded the law, and the
merits of the appeal" (quotation marks and citation omitted)).  Also, a district
court may disentitle a fugitive even if some objectives weigh against
disentitlement, so long as other objectives weigh heavily enough in favor of
disentitlement.  *See United States v. Zedner*, 555 F.3d 68, 77–79 (2d Cir. 2008)
(explaining that, depending on the case, any one of the objectives can be "an
independently sufficient basis on which to apply the fugitive disentitlement
doctrine and dismiss the appeal" and disentitling the defendant even after
concluding that the government was not prejudiced by the defendant's
fugitivity).

Here, the district court considered the same four objectives as we did in
*Bescond* and determined that each weighed in favor of disentitling Bardakova.
*See Bardakova*, 2024 WL 3538969, at *3.  Bardakova takes issue with the court's
analysis on each of these objectives; she claims that she is no different from the
defendant in *Bescond*, for whom we concluded that disentitlement would serve
none of the appropriate objectives.  *See Bescond*, 24 F.4th at 774–75.  We disagree

and conclude, as the district court did, that Bardakova is distinguishable from the defendant in *Bescond* as to each of those objectives.

>   i.    *Enforceability and Mutuality*

"Enforceability" is a bit of a misnomer for what we consider when assessing the first objective of disentitlement.  Obviously, any defendant we deem a fugitive—someone who has fled the country or has allegedly committed a crime in the United States and refused to return—will prove difficult for a court to enforce a decision against.  What we actually consider at this step is "mutuality"—whether "disentitlement is a disproportionately severe response to [the defendant's] absence and therefore too harsh a means" of ensuring that the court can enforce its decisions against the defendant.  *Bescond*, 24 F.4th at 774.  In *Bescond*, disentitlement was a disproportionately severe response because, "[o]ther than to avoid a ruinous designation as a fugitive, Bescond ha[d] no reason to travel" to the United States: she had no "residence, immigration status, job, or family in this country, and she allegedly committed the charged offense entirely from abroad."  *Id.*

Although some of the same considerations may apply to Bardakova— according to her, it "is not shown" that she has residence, immigration status, or

family in the United States, Appellant's Br. at 37 (quoting *Bescond*, 24 F.4th at 774)—the distinctions between her and Bescond make a difference in the mutuality analysis. Bardakova, unlike Bescond, allegedly committed much of the charged conduct in the United States. And she, unlike Bescond, has benefitted from her ties to the United States, including by traveling here to give birth to her own son—making him a U.S. citizen, *see* U.S. Const. amend. XIV, § 1; *United States v. Wong Kim Ark*, 169 U.S. 649, 705 (1898). Under these circumstances, the district court permissibly decided that its inability to enforce its decisions against Bardakova due to her refusal to submit to the court's jurisdiction weighed in favor of disentitling her. *See Bardakova*, 2024 WL 3538969, at *3 (stating that the "gravamen of [her] petition is the posture of heads I win, tails you'll never find me" (quoting *Gao v. Gonzales*, 481 F.3d 173, 177 (2d Cir. 2007)); Oral Argument at 3:22–:30 (Bardakova's counsel confirming that Bardakova is unwilling to return to the United States).

ii.   *Penalty for Flouting the Judicial Process*

Bardakova also varies from Bescond in the degree to which she flouted the judicial process. In *Bescond*, we said that the defendant need not be penalized because she was not "flouting the judicial process"; she merely "stay[ed] home"

27

in France, "where she remained during the allegedly criminal scheme." 24 F.4th at 774. Once again, Bardakova has not merely stayed home—she came to the United States and allegedly engaged in the criminal conduct charged in the indictment. The district court permissibly concluded that Bardakova, unlike Bescond, has "flouted the judicial process." *Bardakova*, 2024 WL 3538969, at \*3 (concluding that this objective weighed in favor of disentitlement because Bardakova "allegedly entered the United States to assist Deripaska in evading lawfully imposed sanctions, did in fact assist Deripaska in doing so, lied to FBI Special Agents, and promptly returned to Russia once she became aware that her conduct attracted the attention of law enforcement").

### iii. *Discouraging Fugitivity and Promoting Judicial Efficiency*

Once again, Bardakova's circumstances are distinguishable from Bescond's as to the likelihood that disentitlement will discourage future flights from justice and promote judicial efficiency. In *Bescond*, disentitling the defendant was unlikely to discourage future flights from justice because the defendant there did not actually flee from anything—she was never in the United States. 24 F.4th at 774. We also observed that there would not likely be many future defendants like Bescond: "her charged offense [was] financial, diffuse, and novel, and it

28

affected the United States—allegedly—only through a chain of other actors in

other countries; she did not act for a criminal organization; she was in a

legitimate line of work, as a banking executive; and her home country protects

her from extradition." *Id.*

Yet again, the key difference is that Bardakova *was* in the United States

during much of the conduct charged in the indictment. Although she challenges

whether the IEEPA applies to her conduct, the charge that she allegedly made

false statements to government officials is not novel and indisputably occurred in

the United States. She was allegedly working for a sanctioned Russian

businessman, if not a "criminal organization," and her efforts in allegedly

helping him evade sanctions was not a "legitimate line of work." *Id.* In short,

Bardakova's case is far more run-of-the-mill than Bescond's—she allegedly

committed a crime on U.S. soil, then left. The district court properly determined

that disentitlement would disincentivize future defendants from doing the same.

*See Bardakova*, 2024 WL 3538969, at *3.

       *iv.   Prejudice*

Finally, as the district court concluded, prejudice to the government

weighs more in favor of disentitlement here than it did in *Bescond*. There, as

29

here, the government claimed that it would suffer prejudice from delays in the

prosecution, such as the risk of stale evidence and unavailability of witnesses.

*Bescond*, 24 F.4th at 774–75; Appellee's Br. at 32–33. But in *Bescond*, we were

skeptical of the government's claim of prejudice because the government did not

indict Bescond until several years after the charged conduct—clearly, time was

not of the essence, despite the government's pleas on appeal. *Bescond*, 24 F.4th at

774–75. Conversely, the government indicted Bardakova less than four months

after the FBI interviewed her. As the district court concluded, the government's

relatively prompt action here "mitigated the risk that [witnesses'] memories

would fade or evidence would grow stale," *Bardakova*, 2024 WL 3538969, at *3—

now, any risk of those harms is almost surely due to Bardakova's continued

absence.

To be sure, the district court did not discuss any countervailing prejudice

to Bardakova. *See Bescond*, 24 F.4th at 775 ("Disentitlement enables the

government to coerce [a defendant's] presence in court by imposing financial,

reputational, and family hardship regardless of her guilt or innocence . . . ."").

But, in this regard, Bardakova is likely not different from any other fugitive.

And again, even to the extent that some prejudice to Bardakova weighed against

disentitlement, the district court could nevertheless have properly concluded that the other objectives that favored disentitlement outweighed any prejudice to Bardakova. *See Zedner*, 555 F.3d at 77–79.

Because the district court considered the objectives of disentitlement and the record supports its analysis on each objective, its decision to disentitle Bardakova was not an abuse of its discretion.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order denying Bardakova's motion to dismiss the indictment.